NORRIS, Judge.
Plaintiff, Soma Enterprises Inc., subles-see of the premises taken, filed suit against defendant, State of Louisiana, Department of Transportation and Development (DOTD), for damages caused by the state’s June 30, 1986 purchase of property located at 3402 Southern Avenue, Shreveport, Louisiana in lieu of impending expropriation. Judgment was signed July 17, 1990 rejecting Soma’s demands. We affirm for the following reasons.

Facts

Pearle Vision Center’s home office (Pearle) leased the Southern Ave. location from October 1978 until October 1993. In May 1981 it subleased the property to Soma, which bought a Pearle franchise for the location. Soma, a corporation wholly owned by Dr. George Bakowski, acquired three Pearle Vision Center franchises in the Shreveport area in 1981 and 1982: 3402 Southern Ave., 8982 Mansfield Rd., and Pierre Bossier Mall.
The Southern Ave. location was profitable until approximately April 1984; thereafter, it consistently lost money. Soma’s franchise agreement prohibited it from closing down the Southern location in spite of its losses because closing one store would be considered a default on all three. Its franchise agreement also provided that the franchisee’s right to occupy the leased premises was subject to the terms of the base lease and that the franchise would automatically terminate if the base lease terminated for any reason that was no fault of Pearle’s. The parties stipulated that Soma had a leasehold interest at Southern Ave. and that the location was purchased by the state on June 30, 1986 in lieu of expropriation for the construction of 1-49.
In 1981 or 1982 Pearle took over a Texas State Optical franchise in St. Vincent Mall, right across the street from the Southern location. Pearle operated the St. Vincent location as a company-owned store and Dr. Bakowski testified at trial that the St. Vincent store was in direct competition with his operation.
Dr. Bakowski hired three different optometrists, each for a different interval, to assist him in running his three locations. After April 1984, he testified he found it difficult to secure assistance for the Southern location because of impending expropriation. He claims that his inability to hire doctors and the knowledge of impending expropriation caused him damages.
Soma’s expert economist, Dr. Terrence M. Clauretie, mathematically calculated Soma’s losses on the upside (beginning April 1984) to be $302,068, and on the downside (beginning June 1985) to be $185,-136. Dr. Clauretie admitted that he had not researched the cause of the losses; he assumed, pursuant to conversations with Dr. Bakowski, that the losses were caused by Soma’s inability to hire doctors. Soma seeks $190,000 in damages plus attorney’s fees, expert witness fees, costs and judicial interest.

*1245
Procedural history

This suit was previously before us in Soma Enterprises Inc. v. State, DOTD, 521 So.2d 829 (La.App. 2d Cir.), writ denied 522 So.2d 572 (La.1988). The lower court ruled that Soma had no right of action because the lease was unrecorded and the property was purchased in lieu of expropriation rather than actually expropriated. We reversed that ruling and remanded. After remand and trial, the trial court rejected Soma’s demands against the State, DOTD for loss of leasehold advantage and economic losses. It found by written opinion that Soma was not entitled to loss of leasehold advantage after June 30, 1986 because the lease automatically terminated by its own provisions when the sale in lieu of the expropriation occurred. State, Through Dept. of Hwys. v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir.1975); Lafayette Airport Comm. v. Roy, 265 So.2d 459 (La. App. 3d Cir.), writ denied 262 La. 1159, 1160, 266 So.2d 444 (1972), cert. denied 411 U.S. 916, 93 S.Ct. 1543, 36 L.Ed.2d 307 (1973); State, Through Dept. of Hwys. v. Sumrall, 167 So.2d 503 (La.App. 1st Cir.), writ denied 246 La. 905, 168 So.2d 820 (1964). The court based its finding on para. 11(A) of the lease:
If, at any time during the term of this lease, title to the entire lease premises should become vested in a public [or] quasi-public authority by virtue of the exercise of expropriation ... or by voluntary transfer from the owner of the leased premises under threat of such a taking, then this lease shall terminate as of the time of such vesting of title, after which neither party shall be further obligated to the other except for occurrences antedating such taking. R.p. 57. (emphasis added)
The court also found that the business losses prior to June 30, 1986 were not com-pensable for several reasons: (1) Soma did not prove that a full-time doctor at Southern Ave. would have made a difference in the volume of business; (2) the losses resulted from the general effects of public works in the area, State, DOTD v. Traina, 537 So.2d 792 (La.App. 2d Cir.), writ denied 540 So.2d 332 (1989); (3) the Pearle franchise across the street had an adverse effect on Soma’s business. The court noted that the expert’s estimated losses were based solely on mathematical figures without consideration of the reasons for the losses.
Soma argues on appeal that it is entitled to constitutional compensation despite the lease provision for automatic termination. It also argues the trial court committed manifest error by attributing Soma’s losses to the competing Pearle franchise across the street and by totally disregarding Dr. Clauretie’s testimony. The state counters that Soma failed to prove any loss of leasehold advantage and that the only economic losses shown were speculative as to cause.

No right of action

An appellate court may notice, on its own motion, the exception of no right of action. La.C.C.P. art. 927; The Research Group, Inc. v. Sharp, 430 So.2d 165 (La.App. 2d Cir.1983). In the instant case, para. 11(C) of the base lease provides:
In the event of any such taking or transfer, whether of the entire leased premises, or a portion thereof, it is expressly agreed and understood that all sums awarded, allowed or received in connection therewith shall belong to LESSOR, and any rights otherwise vested in LESSEE are hereby assigned to LESSOR, and LESSEE shall have no interest in or claim to any such sums or any portion thereof, whether the same be for the taking of the property or for damages, or otherwise. LESSEE may, however, file a separate claim for moving and related expenses. R.p. 57. (emphasis added)
Dr. Bakowski conceded at trial that the state has already reimbursed Soma for its moving expenses, one year’s storage and signs. Thus, the issue presented in this case is whether Soma has a right of action for its lost leasehold interest.
A lessor and lessee may agree how compensation paid by the state for a taking will be divided between them. Holland v. State of Louisiana, Dept. of Transp., 554 *1246 So.2d 727 (La.App. 2d Cir.1989), writ denied 559 So.2d 125 (La.1990). Contracts have the effect of law between the parties. La. C.C. art. 1983. Once an entire right is assigned, the assignee is the proper party to bring suit. La.C.C. art. 2642; C.C.P. art. 698; Keith v. Comco, 574 So.2d 1270 (La.App. 2d Cir.), writ denied 577 So.2d 16 (La.1991). Pearle assigned its rights arising from a taking to its lessor.
Moreover, it is a basic precept of law that a sublessee cannot have greater rights than the original lessee obtained in the original lease. Ducote v. Callico, 307 So.2d 644 (La.App. 4th Cir.), writ denied 309 So.2d 337 (La.1974); Scott v. Kalip, 197 So. 205 (La.App. 2d Cir.1940); Miles v. Kilgore, 191 So. 556 (La.App. 2d Cir.), writ denied (unreported, 1939); 51C C.J.S., Landlord and Tenant, § 48(1) (1968). Soma cannot have a right of action for damages arising from the instant transfer unless the right was reserved to Pearle in the original lease.
In State, DOTD v. Exxon, 430 So.2d 1191, 1194 (La.App. 1st Cir.), writ denied 437 So.2d 1155, 1156 (La.1983), the court interpreted the following lease provision:
Any and all payments made for or arising from any such taking or for damages to the premises resulting therefrom, shall belong and be payable entirely to Exxon, and Lessee hereby waives any right to any part of the award, and hereby assigns same to Exxon. (emphasis added)
The First Circuit, narrowly construing this provision, found it included payments for taking and for damages to the premises (severance damages); however, it found the language was not sufficient to cover business losses.
The provision in the instant case, however, contains broader and more encompassing language. It provides that all sums which may be awarded, allowed or received in connection with such a taking or transfer shall belong to the lessor. In addition, it provides that, “any rights otherwise vested in lessee are hereby assigned to lessor[.]” R.p. 57. Thus, Pearle clearly assigned its right to claim damages, including business losses, to the property owners. Soma never possessed such rights and has no right of action in this matter.

Proof of loss

Even assuming, without holding, that Soma had a right of action, we would be constrained to affirm the trial court’s judgment. Despite some misstatements of the law in its reasons for judgment, the court was not plainly wrong in finding that Soma failed to prove by a preponderance of evidence that the impending expropriation and transfer in lieu thereof caused its business losses.
First, the erroneous legal conclusions: the trial court erred when it found the “self-destruct” clause in the lease deprived Soma of its claims for damages after the June 30, 1986 transfer. The cases so holding and cited by the trial court all involved takings which occurred prior to the enactment of the Louisiana Constitution, Art. 1, § 4 in 1974. A lessee does not relinquish its right to constitutional compensation for a transfer in lieu of expropriation just because the lease contains a clause terminating the lease upon such transfer. Holland, supra. Such a clause merely restates the existing law as set forth in La.C.C. art. 2697. The trial court also erred in holding that business losses are not compensable because they resulted from the general effects of public works, citing Traina, supra. The precise holding of Traína is that damages are not compen-sable if impairment to access of a public roadway is general to the public at large. Soma’s clientele always had continuous, unimpaired access to the premises. Thus, Traína is not applicable to the instant matter.
Nevertheless, the trial court’s conclusion as to Soma’s failure to prove by a preponderance of the evidence that the pending expropriation caused its business losses is not plainly wrong on this record.
A lessee is entitled to the full extent of its losses, including economic loss to business; however, the method employed for proof of loss must demonstrate by a preponderance of the evidence that an actual *1247 loss was sustained by the business because of the taking. La. Const. Art. 1, § 4; State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990); State, Through Dept. of Hwys. v. Constant, 369 So.2d 699 (La.1979); Traina, supra; State, DOTD v. Caroline Atkins Crawford Business Trust, 538 So.2d 1078 (La.App. 3d Cir.), writ denied 542 So.2d 1381 (La.1989). Speculation, conjecture, mere possibility and even unsupported probability are not sufficient to support a judgment. State, DOTD v. Jacob, 491 So.2d 138 (La.App. 3d Cir.), writ denied 496 So.2d 331 (La.1986).
Soma did not attempt to prove loss of “leasehold advantage,” which is defined as the monetary difference between the rent lessee contracted to pay and the price the property would lease for at the time of the taking. State, Through Dept. of Hwys. v. Levy, 242 La. 259, 136 So.2d 35 (1961); State, Through Dept. of Hwys. v. Cockerham, 182 So.2d 786 (La.App. 1st Cir.1965), writ denied 249 La. 110, 185 So.2d 219 (1966). It presented no evidence of the market value of Soma’s lease at the time of the taking; thus, Soma did not prove loss of leasehold advantage.
It did, however, attempt to prove that it had business losses caused by the impending expropriation and the ultimate “taking.” The trial court heard Dr. Clauretie, Soma’s economic expert, testify concerning business losses sustained by Soma through the end of its lease term, October 1993. Dr. Clauretie testified, “I think in this particular case, it’s almost impossible to identify a point in time at which the losses definitely began, and at which the profits ended, because of the expropriation.” R.p. 150 (emphasis added). He prepared two figures, an “upside” and a “downside,” both based on financial data furnished by Dr. Bakowski.
Since Soma’s losses began April 1984, he chose that date as the starting point for his upside calculation. Soma had an average monthly profit of $2,387 from January 1982 through April 1984. From May 1984 through June 1986 it sustained monthly average losses of $2,431. Thus, from April 1984 through June 1986, sustained losses plus lost profits were approximately $4,818 per month or $125,268. Then, Dr. Claure-tie added in the loss of monthly profits up to the date of the trial, July 6, 1989 ($2,387 X 36 months or $85,932). Finally, he added in Soma’s loss of profits through the end of the lease, October 1993 ($2,387 X 52 months) discounted at 15% for a present value of $90,868. The total of his upside calculation is $302,068.
For the downside calculation, Dr. Claure-tie started with June 1985. From January 1982 through June 1985, Soma’s average monthly profit was $1,475. Soma’s average monthly losses from July 1985 through June 1986 were $4,866. Thus, through June of 1986, Dr. Clauretie calculated that Soma sustained losses of $6,630 per month, or $75,960. Then, he calculated the lost profits up to date of trial ($1,474 X 36 months, or $53,064). Finally, 52 more months of lost profits discounted at 15% gives a present value of $56,112. Dr. Clau-retie’s total downside business loss calculation for Soma is $185,136.
The trial court was more impressed by facts that refuted the claim that impending expropriation caused these business losses. The record shows that Dr. Bakowski had routinely rotated available doctors, including himself, between his several Pearle locations. Soma argued, however, that general knowledge of the expropriation made it increasingly difficult to find doctors willing to work at the Southern Ave. store, and that the declining profits there were partly due to this personnel problem. Dr. Bakow-ski testified that about 50 to 80% of the prescriptions filled by the optical dispensary were written by the doctor on the premises; such dispensaries “need a doctor to keep their sales up.” R.p. 97. However, the record shows that the Southern Ave. store made a profit from June 1981 until September 1982, a period in which Dr. Ba-kowski hired no doctors at that or any other location. In September 1982, about one month after opening the Bossier Mall store, Dr. Bakowski hired Dr. Gordon, who spent about 80% of his time at the Southern Ave. store, with Dr. Bakowski himself spending the rest. Gross sales declined significantly during this period despite the *1248 fact that a doctor was present there 100% of the time (though the store was still profitable). After Dr. Gordon left in July 1983, gross sales at Southern Ave. remained about the same, even though Dr. Bakowski was once again covering all three locations.
According to Dr. Bakowski, Southern Ave. ceased being profitable in the spring of 1984. At about this time he hired Dr. Laborde, who split his time equally between the Mansfield Rd. and Bossier Mall locations. Despite the additional help, Dr. Bakowski chose to spend only about 40% of his time at Southern Ave. because “there wasn’t enough business at that time for me to be occupied for 50%.” R.p. 124. In July and August 1985, while Southern Ave. was still losing money, Dr. Bakowski succeeded in hiring a full-time optometrist there, yet it continued to show a loss despite increased gross sales.
A review of this evidence undermines Dr. Bakowski’s argument that the business’s profitability was dependent on the presence of a resident doctor, whether or not the impending expropriation made recruiting such doctors difficult. The only evidence linking Soma’s business losses to the expropriation was the uncorroborated, self-serving testimony of Dr. Bakowski.
Dr. Clauretie frankly admitted that he based his calculations solely on mathematics and he did not investigate the reasons for the losses. Pursuant to conversations with Dr. Bakowski, he assumed the store’s losses were caused by its inability to hire doctors because of the impending expropriation.
The trial court observantly noted that the major cause of Southern Ave.'s losses seemed to be the competing Pearle franchise in St. Vincent Mall. That Pearle franchise provided the exact same products and services as Soma’s operation, and it was just across the street. In light of the impact of the additional Pearle outlet, the trial court was not plainly wrong to disregard Dr. Bakowski’s self-serving testimony and conclude that Soma did not prove by a preponderance of the evidence that impending expropriation caused Soma’s claimed business losses. Dietrich, supra. If the business losses Soma was experiencing prior to and at the time of the taking were not caused, as found by the trial court, by the taking, then Soma’s claim for lost profits from June 1986 through the end of the lease must also fall.
We conclude that Soma has no right of action in this matter. Even if it did, the trial court’s conclusion that Soma failed to prove its claims for constitutional compensation by a preponderance of the evidence is not clearly wrong. Accordingly, we affirm the trial court’s judgment rejecting Soma’s demands for the reasons stated, at appellant’s cost.
AFFIRMED.