427 So.2d 1304 (1983)
CITY OF SHREVEPORT, Plaintiff-Appellant,
v.
STANDARD PRINTING COMPANY OF SHREVEPORT, INC., Defendant-Appellant.
No. 15189-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1983.
Rehearing Denied April 7, 1983.
*1305 Roland J. Achee, Asst. City Atty., Charles C. Grubb, City Atty., Shreveport, for plaintiff-appellant.
Sockrider & Bolin by H.F. Sockrider, Jr. and James E. Bolin, Jr., Shreveport, for defendant-appellant.
Before MARVIN, FRED W. JONES and NORRIS, JJ.
FRED W. JONES, Judge.
The City of Shreveport ("City") instituted this action to expropriate property of Standard Printing Company of Shreveport, Inc. ("Standard"), located in downtown Shreveport, in connection with a project involving construction of a mass transit bus terminal. The defense, in essence, was that Standard's total loss resulting from the taking far exceeded the $165,000 last tendered by the City.
After trial, judgment was rendered in favor of Standard for: $573,006, representing *1306 the cost of acquisition of another downtown lot ($49,000) and construction cost of a comparable building ($524,006); $10,475 for loss of business during the move to new facilities; $80,000 as attorney fees. The City was also assessed with payment of court costs, including expert witness fees totaling about $14,000.
The City appealed, contending the trial judge erred in rendering judgment in favor of Standard for any amount in excess of $160,000 because: (1) Standard failed to prove the necessity of relocating its business in the downtown area and (2) Standard failed to prove that its business had a value in excess of the cost of relocating in the central business district.
Standard also appealed, arguing that the trial court committed error in fixing attorney fees and an expert witness fee (Graham, real estate appraiser) in amounts below those stipulated by the parties as being fair and reasonable.

Factual Context
Standard is a family owned corporation which has been engaged in the printing and office supply business at its present location in downtown Shreveport since about 1941. All five stockholders are employed in the business, with three working fulltime and two on a part-time basis.
Standard's building, which occupies the entirety of the downtown lot owned by the corporation (measuring 40' × 120') was constructed in 1922 and remodeled in 1945, and is of masonry and steel construction. The downstairs area of the building contains 4800 square feet. The front 20 foot section houses Standard's office supply department and the rear 100 foot section is an open area where the printing plant is located. The lower level of the building is air conditioned and also has central heating. In addition, the building has a mezzanine area containing 4800 square feet, which is used for the storage of office furniture, office supplies and paper for the printing operation. Access to the mezzanine is provided by a manually operated elevator. The mezzanine is not air conditioned.
As a result of this expropriation, Standard had the following options: going out of business; relocating outside the downtown area; relocating in the downtown area; or relocating outside the downtown area, but maintaining a customer relations office in the central business district.

Trial Judge's Findings and Rulings
In a comprehensive written opinion, the trial judge concluded: he was not presented with any evidence of reasonable alternatives to Standard's primary solution of constructing a new building on an available downtown lot; the evidence preponderated in favor of Standard's position as to the inadequacy of the City's experts' estimate of the cost of replacing its building; although Standard's building had a remaining economic life of only 20 years, no deduction should be allowed for depreciation in calculating replacement costs; the court was not bound by the stipulation of the parties relating to the reasonableness of attorney fees and expert witness fees.
The trial court accepted the estimate of Standard's expert witness that $573,006 would be required to place Standard in a building downtown, comparable to its present facility, where its business operations could be continued.

Applicable Law on Expropriation
The owner of property expropriated must be compensated to the full extent of his loss. 1974 Louisiana Constitution, Article 1, Sec. 4.
Our jurisprudence has construed the effect of this provision as a broadening of former constitutional concepts pertaining to measure of damages by permitting the property owner to remain in equivalent financial circumstances after the taking. In appropriate cases the owner may recover the cost of replacing his expropriated property. Although the usual method of calculating replacement costs includes a reduction for depreciation, this is not necessarily required in every case since depreciation is designed to deduct for functional obsolescence rather than for a theoretical waning of life expectancy. The fact that the award *1307 to the property owner may exceed the market value of the property taken is not constitutionally significant. State v. Constant, 369 So.2d 699 (La.1979); Monroe Redevelopment Agency v. Succn. of Kusin, 398 So.2d 1159 (La.App. 2d Cir.1981); City of Shreveport v. Bernstein, 391 So.2d 1331 (La.App. 2d Cir.1981).
In expropriation cases the trial judge's determination of the amount of the property owner's loss is a finding of fact which an appellate court may not disturb in the absence of manifest error. City of Shreveport v. Pupillo, 390 So.2d 941 (La. App. 2d Cir.1980).

Award for Relocating Business
In connection with its basic complaint that the trial judge's award to Standard was excessive, the City asserts several different allegations of error.
First, it contends that in finding Standard proved the necessity of relocating in the central business district, the trial judge erroneously considered the answers to questionnaires which were not filed in evidence; the survey in question was weighted in favor of Standard; and Standard failed to call anyone to testify on this issue from the two downtown office supply companies that furnished 80% of Standard's printing business.
As previously noted, Standard has been doing business at its present downtown location about 40 years. Frank Fulco, Standard's president, estimated that some 90% of its sales are made to customers whose stores and offices are situated in the Shreveport central business district. Fulco testified that, when notified by telephone, he would often go to a customer's place of business to pick up a written order. It was his opinion that a relocation of Standard's business outside the downtown area would have a significant adverse effect upon the business.
Drs. Clauretie and Harju, economics professors at LSU-Shreveport, were retained by Standard to determine the full extent of the economic loss likely to be sustained as a consequence of the expropriation. After considering all data deemed relevant, these experts concluded that a relocation by Standard away from the central business district would result in a loss of customers and, conversely, to suffer the least economic loss Standard should relocate in downtown Shreveport.
In connection with this latter finding, the professors examined the answers given on questionnaires returned by 55 of Standard's customers. The City contends the trial judge committed reversible error in considering those questionnaires, which were not filed in evidence.
If this was error on the trial judge's part, it was harmless. Other evidence in the record, including the history of Standard's business operations at its present location and the geographical proximity of the bulk of its customers, amply supports the trial court's finding of fact on this issue. Therefore, he was not clearly wrong in determining that Standard proved the necessity of relocating in the central business district. Besides, the evidence indicated that a relocation away from the downtown area would entail higher land acquisition costs than a downtown relocation.
The City next argues that the trial judge erred in fixing as the replacement cost of Standard's business property the figure submitted by Standard's expert witness rather than those estimates made by the City's real estate appraisers.
Expert commercial real estate appraisers testifying on behalf of the City were Walter Hunter and Jack Landon. Hunter stated that he viewed Standard's building as a one story structure and computed its replacement cost to be $155,568  exclusive of the cost of another lot. In calculating that replacement cost Hunter considered the present building "as is" without allowing for changes required by the municipal building code.
Landon also considered Standard's building to be a single story structure. He estimated the replacement cost at $152,450, including an allowance of $5,000 for another *1308 manually operated elevator. Although the evidence indicated that the building code does not permit the installation of this type of outmoded elevator, Landon stated that his estimate contemplated new construction that would comply with the building code.
Richard Gay, Standard's expert witness, is a civil engineer and an officer of the Werner Construction Company, with extensive experience in the construction of commercial buildings.
Gay estimated that it would cost $524,000 to construct a building as similar as possible to Standard's present building, but allowing for changes required by the municipal building code. This compliance would require that the new construction differ from the present building in the following respects: (1) 8 foot ceiling on the second floor rather than 6 foot ceiling; (2) an electric or hydraulic elevator instead of manually operated elevator; (3) addition of interior stairs.
Taking into consideration the $49,000 cost of a lot on Crockett Street where Standard proposed to relocate, Gay arrived at a total replacement cost of $573,000.
The City's basic attack leveled at Gay's estimate is that it places Standard in a much better facility than its present building rather than in a similar structure as required by law. As explained above, the primary differences between the present building and the new structure (including a more spacious second floor) involve improvements required by the municipal building code. Though concededly expensive, particularly an electric elevator installation estimated to cost about $75,000, these features are dictated by considerations beyond the control of Standard. Since it is being compelled to relocate because of this taking rather than by choice, Standard should not be penalized because the City also mandates that it construct a better facility than it presently enjoys.
Incidental to this last argument, the City also contends the trial judge erred in failing to allow for the depreciation of Standard's present building.
In Constant, supra, marina owners whose property was expropriated were held entitled to recover the replacement costs of a loading and parking area for their business operations. In reversing the lower court's deduction for the depreciated value of the former loading area, the Louisiana Supreme Court explained:
"(M)ore probably than not, despite its theoretical 30-year life expectancy, the expropriated loading strip at the end of thirty years would have still been as serviceable to them as on the date of taking.
"The theoretical calculation of a 50-year life expectancy, for tax or accounting purposes, does not seem to us to provide an appropriate guide to compensating the present landowners for the cost of the replacement of their indefinitely serviceable loading area, with a new loading area no more serviceable to them, and which only theoretically will have a longer life than the one which was expropriated from them." (p. 706)
Confronted with this issue in the Monroe Redevelopment Agency case, supra, we commented:
"(A)lthough the usual method of calculating replacement cost includes a reduction for depreciation, this is not necessarily required in every case. Depreciation is designed to deduct for functional obsolescence, i.e., incurable depreciation.
"(I)t was shown that the use of the warehouse and the showroom did not require modern facilities and in fact, part of the business's image was one of low overhead by virtue of its antiquated facilities. In addition, both of agency's appraisers testified that the use lifetime of the old buildings was from 50-100 years. Such a period of time constitutes a `lifetime use' and no deduction should be made for depreciation." (p. 1161)
Here, the expert witnesses were unanimous in describing Standard's building as structurally sound, with no functional obsolescence. Gay estimated that the building had a remaining lifetime, assuming routine maintenance and repair, of 50-100 years. Although Landon assigned the structure an *1309 "economic life" of only 20 years, he explained that this was irrelevant to the question of how long a building may stand and serve the purposes of a particular owner.
Under the circumstances of this case, we do not find that the trial judge was clearly wrong in his refusal to deduct for depreciation of Standard's present building in his calculation of replacement costs. Further, the trial court did not commit manifest error in accepting Gay's figure of $573,000 for those replacement costs.
The City has emphasized that the trial judge's award to Standard is substantially in excess of the stipulated $160,000 fair market value of the expropriated property. Addressing this same argument, the Court in Constant, supra, noted:
"... an enrichment is not `unjustified,' if justified by law (i.e., if there is a legal cause for it), as would be the case if the constitutional provision so requires that a landowner must be fully compensated for his loss." (p. 706)
Last, assuming the correctness of the trial judge's award for relocation costs, the City argues that Standard cannot recover those costs in the absence of proof that they were less than the fair market value of Standard's business. In essence, on this question the City's attack is directed at Dr. Clauterie's opinion, based upon his use of the "Gordon Model" equation (and allowance of "normal" annual salaries to the working stockholders of $37,400), that the business had a value of $973,913 to a nonworking third party purchaser.
Dr. Harju stated that, regardless of the statistical approach or method employed to place a value on Standard's business, the resulting figure would be almost twice the cost of replacement.
In Constant, supra, the State contended that the property owners should have used a different method to prove business losses occasioned by the taking. Answering this argument, the court reasoned:
"If the department felt that a capitalized-income approach would be a more adequate basis by which to estimate the landowners' loss, the department itself could have produced evidence to this effect. For instance, discovery and subpoenas of the defendants' business records could have supplied this information for the trier of facts." (p. 705)
That logic applies with equal cogency here. The City had available for examination by experts the same data upon which Drs. Clauterie and Harju based their opinions, but failed to offer for the trial court's consideration any alternative estimate of the value of Standard's business. Be that as it may, the record establishes to our satisfaction that this value exceeded by a considerable amount the cost of relocation. Therefore, the trial judge's use of the latter figure in computing Standard's loss resulting from the taking was appropriate.

Award for Attorney Fee and Expert Witness Fee
At the trial the parties stipulated that if Standard was awarded attorney fees, 25% of its recovery in excess of the City's final offer of $165,000 would be reasonable. They further stipulated that the fee of $4,500 charged by Standard's real estate appraiser, Marshall Graham, was fair and reasonable. Concluding that he was not bound by these stipulations, the trial judge fixed the attorney fees at $80,000 and the expert witness fee of Graham at $2,500. Standard contends that these awards were inadequate and that the sums stipulated were reasonable.
We agree with the trial judge that he was not bound by these stipulations, since a determination of the reasonableness of such awards is exclusively a prerogative of the court rather than the litigants.
La.R.S. 19:8 sanctions the award of attorney fees in cases of this nature by providing that "if the highest amount offered is less than the compensation awarded, the court may award reasonable attorney fees."
Even where parties purport to fix the amount of an attorney fee by contract, our courts may still inquire into the reasonableness of that fee. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982).
*1310 In this case the trial court's award amounted to approximately 20% of the difference between the City's last offer and the court's award for Standard's relocation costs. After reviewing factors pertinent to the fixing of a reasonable attorney fee, we do not find an abuse of trial court discretion in making this award. However, for legal services rendered in connection with this appeal, we will allow Standard an additional $2,000.
As to the expert witness fee awarded to Graham, there was no abuse of the trial judge's broad discretion. See La.R.S. 13:3666.

Decree
For the reasons explained, the district court judgment is amended to increase the attorney fee awarded to Standard from $80,000 to $82,000 and, as AMENDED the judgment is AFFIRMED, with costs of appeal assessed to the City.