MARVIN, Judge.
The State appeals from a judgment awarding the owner of a fractional ½ interest $114,809 for the expropriation of that interest for which the State had deposited $57,924 as its estimate of just compensation under the quick-taking statute, LRS 48:441-448.
The State contends that the trial court erred in weighing the testimony of the experts and in not rejecting the testimony of plaintiff’s expert relative to the value of what was taken, severance damage to the remainder, and in awarding loss of rental revenue. Recognizing that a trial court has *462 discretion in accepting or rejecting in whole or in part the testimony of expert and lay witnesses, we find no abuse of that discretion and affirm.
The State concedes that the part taken consisted of 10,935.69 square feet of land valued at $3.25 per square foot and all of the improvements on or partially on the part taken. The improvement on the part taken was an office building which the landowner had leased to three tenants. The value of this building is the real issue in this action. This facsimile of the State’s plat shows the location and pertinent detail of the property which was expropriated in part to facilitate the congestion of traffic at the intersection adjacent to the main gate of Barksdale Air Force Base.
[[Image here]]
The trial court noted:
The facts show that the property was commercial property and was used by the defendant to house commercial tenants. The intersection where this property is located is one of the most highly trafficked areas in Bossier City. The experts differ on the desirability of the location, but there is no question but that the building, which was a total loss, was in good condition. Defendant had taken an existing service station and had rebuilt the structure. According to the testimony of one of the state’s own expert ... [an expert in the cost of construction], the building was of excellent construction. [This expert,] Mr. Rockhold, said,
“And, of course, when I made my survey I could determine exactly what the type of construction was. They had taken the service station, which appeared to have been in concrete block walls, and had wrapped around it, across the front and on one end a wood frame building that was very neatly built, very nice construction. They had put simulated stone panels on the outside, they had a facier on the top, they had carpet, laid in accoustical tile, it was a wood frame building as far as I was concerned at that point, but it was of excellent construction.” * * *
*463 ... He [Rockhold] did a cost analysis for the state in November of 1978. His estimate of replacement cost for the improvements new was $179,924.00. This, he said, would be a contractor’s price and would not include other matters such as architect’s fees, if any.
... Both Mr. McNew and Mr. Fulco [the state’s experts] believe that the most accurate method of appraisal is the market data approach which enables one to determine what willing buyers and sellers are doing in the market. Mr. Montgomery [the landowner’s expert] does not disagree with that, but he believes that the market data approach is not a valid approach in this particular case because of the unique location of the property. Consequently, he valued the property at a figure between his higher cost approach figure and his lower income approach figure. It is significant that in his cost approach method, he valued the improvements, all of which were destroyed by the taking, at $177,435.54 and the state’s witness, Mr. Rockhold, estimated the cost of replacing the improvements at $179,-924.00, remarkably close estimates. * *
In the opinion of the court, all of the criteria used by the experts in this case are criteria which the court should consider in attempting to arrive at a just compensation for the defendant. The Court is of the opinion that because of the unique location of this property at the highway intersection near the West Gate entrance to Barksdale Air Force Base with its high traffic exposure, the market data approach does not have the significance it would have if there were similar physical locations which could be used as comparables. The Court does, therefore, place more weight on the other approaches than it would in other circumstances. In the cost approach, Mr. Montgomery and Mr. Rockhold arrive at similar figures in valuing the improvements and particularly since Mr. Rockhold is a witness for the state, the Court is of the opinion that the preponderance of the evidence supports the cost approach value as estimated by defendant’s expert. The income approach had Mr. Montgomery at $195,000.00; Mr. McNew at $154,100.00; and Mr. Fulco at $122,650.00. Mr. Fulco explained that his income approach was low because he thought that the building was misplaced and the property could not be utilized to the maximum, so he really discounted using this method at all. Mr. Fulco said that defendant had actually made a bad investment on this property which he said was traffic bound much of the time and had its building misplaced. He said it was all right for a service station, but not that good for other commercial use. But according to the evidence, the defendant was using the property for the purpose for which he acquired it, namely, renting it to commercial tenants, without any problem in obtaining tenants up until the announcement by the state of its construction plans at that intersection. * * *
Considering all of the evidence, giving consideration to the several methods of valuation used by the experts, the Court is of the opinion that the evidence supports the conclusion that a just valuation of the property taken is the sum of $185,-000.00, one-half of which is attributed to the defendant. The Court is also of the opinion that the remaining property is damaged by the severance because of its reduced size and restricted access. Experts for the state testified that the severance damage was slight, if any, and the defendant’s expert claimed that the taking effectively destroyed the remainder. In the opinion of the Court, the evidence establishes that the remaining property does have some commercial use, although the use has been severely curtailed, and that its value has decreased in the amount of fifty percent by the severance. Before the taking, the 8,899.06 square feet which remain was valued at $3.25 per square foot or a total value of $28,-921.94, defendant’s one-half being $14,-460.97. After the taking, with severance damage amounting to fifty percent, the defendant’s one-half interest is valued at *464 $7,230.48 which is also the amount of his severance damages.
The Court is also of the opinion that the preponderance of the evidence establishes that defendant did in fact lose the sum of $15,079.00 in rent income from the first announcement by the state of the taking to the date of the taking.
* * * * * *
Accordingly, there should be judgment herein in favor of the defendant in the total amount of $114,809.48 less the deposit of $57,924.50, or a total amount of $56,884.98, plus legal interest.
The trial court’s value of $185,000 is lower than the landowner’s expert appraisal of $225,000 and is higher than the appraisals of the State’s experts (approximately $120,-000). The landowner’s appraiser initially considered the remaining property to have been effectively “lost” by the partial taking and, when pressed, would assign only a $1 per square foot value to the remainder after the taking. The State’s experts assigned, respectively, $0 and $2,892 as severance damage to the remainder. The trial court found the remainder to have a value after the taking of $1.625 per square foot (½ of the $3.25 per square foot value before the taking).
The State complains that the trial court erred in allowing the landowner the loss of rental revenue because this claim was not established to a legal certainty and by a preponderance of the evidence. The State argues that it should not have to pay the landowner for this loss because the landowner voluntarily reduced the rent to induce the tenants to stay in the building until the actual notice to vacate was given and voluntarily allowed the tenants to move to other available rental properties instead of holding them to, and enforcing against them, their lease obligations. We find no error in this respect.
The State announced in late 1976 that it would undertake the construction project. The taking occurred in December 1979 and the remaining tenant was notified by the State to vacate no later than April 2, 1980. The other tenants vacated after the announcement and before the taking and the landowner showed that his rent for the period between January 1977 and December 1, 1979, was less than before the announcement. In a similar situation where the expropriator contended that the landowner-lessor should not be entitled to recover because his tenants had “breached” their leases, we recognized that the landowner was simply seeking recovery of a loss occasioned by the contemplated expropriation proceeding. We held that LSA-Const. Art. 1, § 4, required the owner to be compensated to the full extent of his loss. We said:
The record in the case under consideration establishes that the defendant lost rental income because of the City’s action, or inaction, incidental to the expropriation proceeding. Denying recovery of that loss would violate the constitutional mandate that the owner “be compensated to the full extent of his loss.” Further, contrary to the ruling in Constant, he would not “remain in equivalent financial circumstances after the taking.”
For these reasons we conclude that the trial judge was correct in making this award of lost rentals to the defendant and properly acted within his discretion in computing the amount due, based on the period that elapsed between the visit of the City’s appraisers to the property in August, 1976 and the filing of the expropriation suit in April, 1978.
City of Shreveport v. Bernstein, 391 So.2d 1331, 1334-35 (La.App. 2d Cir.1980)
In Bernstein, supra, we also recognized that the trier of fact is not required to accept or reject the testimony of each witness in toto. The trial judge is not required to accept the precise amount of any expert. He may instead make an award in an amount to which no expert testifies since the trial court is empowered to evaluate the weight to be given to each witness’ testimony, as well as to make factual determinations as to which of the facts relied upon by the witnesses relevantly influences market value.
*465 Market value may be calculated by the comparable sales method, by the income capitalization, or by the replacement cost less depreciation method. M. Dakin & M. Klein, Eminent Domain in Louisiana, 30-31 (1970). Compare City of Shreveport v. Standard Printing Co., 427 So.2d 1304 (La.App.2d Cir.1983), writs granted, where all of the building was also taken.
For reasons assigned by the trial court, which we adopt and summarize, and at appellant’s cost, the judgment is affirmed.