SEXTON, Judge.
The defendant, Van Otis Griffith, appeals the quantum awarded to him as compensation for the expropriation of his property by the plaintiff, the State of Louisiana, Department of Transportation and Development (DOTD). We affirm.
Mr. Griffith was the owner of a 19,200 square foot tract of land with improvements thereon located at 5909 Dillman Avenue in Shreveport. The property contained 12,575 square feet of enclosed building with an additional 1,160 square feet of covered loading area. The property housed Mr. Griffith’s sole proprietorship, Tri-State Carpet Cleaners. The adjacent property housed Steel Erectors, Inc., a company in which Mr. Griffith is the sole stockholder.[1] On October 19,1987, the DOTD expropriated this tract of land for the construction of Interstate Highway 49. DOTD deposited into the registry of the court $123,600, its estimate of Mr. Griffith’s loss from the expropriation. Mr. Griffith responded to the expropriation suit seeking an increase in the amount of compensation.
At trial, Mr. Griffith testified to the nature of Tri-State Carpet Cleaners. It is primarily involved in the cleaning and repair of oriental rugs; carpeting is also sold. It has customers throughout the area, from Texarkana, Monroe, Natchitoches, and Longview, although the majority of its customers are located close to the Dillman Avenue location in the South Highland, Pi-erremont, and Spring Lake sections of Shreveport. Tri-State Carpet Cleaners generally picks up the rugs from the homes of its customers, performs the necessary work, and then returns the merchandise. Mr. Griffith admitted that the only specialized needs of the business are poles on which to hang the rugs to dry and open space in which to dry and store the rugs.
The Dillman Avenue location was actually composed of several buildings which had been specially constructed at periodic intervals since 1952 at the direction of Mr. Griffith. Included among these buildings were a combination office, kitchen, and display building of 1,676 square feet, a welding shop of 1,620 square feet, a northern warehouse building of 3,398 square feet, a southern warehouse building of 4,995 square feet, and a rear storage building of 587 square feet. The welding shop was apparently used primarily for production of a mechanical rug dusting machine. Evidence showed that the northern warehouse building was largely under utilized, being used occasionally to store furniture of customers whose residences had been flooded or damaged by fire. The bulk of the rug cleaning and repair business appears to have been conducted in the southern warehouse building. This building had 45 to 50 rug poles suspended from the roof on which to dry the rugs. The roof was designed to be strong enough to support the rugs on these poles. The southern warehouse building also had a wash area with a drain and a separate drying room, with both heaters and fans for drying the rugs.
Since the expropriation, Tri-State Carpet Cleaners has leased what Mr. Griffith described as a “temporary” location at 500 West 62nd Street in Shreveport. The leased premises include an office building of 2,700 square feet, a building of 1,000 square feet in which the welding shop has been relocated, and a 4,000 square foot building where the carpet cleaning is primarily performed. The leased premises also contain a 9,600 square foot partially *631 enclosed building, which has a roof and two walls, with the remaining two sides open. Both Tri-State Carpet Cleaners and Steel Erectors, Inc. conduct business from this new property; Mr. Griffith estimated that 90 percent of the premises is occupied by Tri-State. According to Mr. Griffith, due to the reduced size of the new location, TriState Carpet Cleaners has only 40 percent of the business it had before the expropriation.
Expert real estate appraisers testified for each side; Clifford J. McCormick on behalf of Mr. Griffith, and Keats Everett and James C. McNew on behalf of the DOTD. Mr. McCormick valued the expropriated property at $147,000. He estimated that to replace the property, Mr. Griffith would have to spend $200,000 to $240,000 to purchase and modify preexisting structures or $293,876 to build a new structure. Mr. Everett valued the expropriated property at $123,600 and found this amount would be sufficient to replace the property, citing comparable properties with list sale prices of $117,000 to $207,500.[2] Mr. McNew valued the expropriated property at $117,000 and, like Mr. Everett, found that the market value was equal to the replacement value.
Following the bench trial, the trial court rendered judgment ordering DOTD to pay Mr. Griffith $6,400 in addition to the amount deposited with the court, plus interest, court costs, $3,500 in expert witness fees, and $1,600 in attorney fees.
The trial court’s written opinion reveals that it did not consider the expropriated property unique in nature and location, nor indispensable to Mr. Griffith’s business. Accordingly, the trial court found that market value of the property was the appropriate amount of compensation, specifically rejecting Mr. Griffith’s argument that he should have been awarded the replacement value to fully recompense his loss. The trial court, after weighing the expert and other testimony, found that $130,000 constituted the market value of the expropriated property and would fully compensate Mr. Griffith for his loss.
Mr. Griffith’s appeal challenges the finding that the expropriated property was not unique in nature and location and not indispensable to his business. He thereby argues that he should have been awarded replacement value and not market value[3] for the property. Mr. Griffith argues that he should be awarded $294,000, the approximate amount proposed by Mr. McCormick as sufficient to build a new replacement facility.
Property may not be taken or damaged by the state except for public purposes and with just compensation to the owner. In every expropriation the owner shall be compensated to the full extent of his loss. LSA-Const. Art. 1, § 4; State, Department of Transportation and Development v. Lobel, 571 So.2d 742 (La.App. 2d Cir.1990), writ not considered, 575 So.2d 360 (La.1991), reconsideration denied, 577 So.2d 2 (La.1991). The determination of what amount will compensate a landowner to the full extent of his loss must be made on the basis of the facts of each case and in accordance with the uniqueness of the thing taken. State, Department of Transportation and Development v. Hammons, 550 So.2d 767 (La.App. 2d Cir.1989); Southern Natural Gas Company v. Poland, 406 So.2d 657 (La.App. 2d Cir.1981), writ denied, 412 So.2d 86 (La.), cert. denied, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982).
Generally, full compensation is measured by the market value of the expropri *632 ated property or the price which would be agreed upon between informed and willing buyers and sellers under usual and normal circumstances. State, Department of Transportation and Development v. Hammons, supra; State, Department of Transportation and Development v. Fakouri, 541 So.2d 291 (La.App. 3rd Cir.1989), writ denied, 544 So.2d 405 (La.1989). However, the expropriatee is not limited to the market value of his property, if such does not fully compensate his loss. State, Department of Transportation and Development v. Dietrich, 555 So.2d 1355 (La.1990); State Department of Highways v. Constant, 369 So.2d 699 (La.1979).
In unusual situations, the market value of the expropriated property constitutes insufficient compensation and the expropria-tee is entitled to replacement value, the amount necessary to reconstitute the property. However, an award of replacement value is the exception, not the rule.
We do not, by these rulings, announce any general principle that replacement cost is always the most appropriate measure of awarding a landowner compensation for the taking of a physical asset used in his business....
Generally, we assume, the landowners may be compensated fully by other approaches than by awarding them the replacement cost of the improvement taken, especially where (unlike the present instance) the property is not shown to be both unique in nature and location and also indispensable to the conduct of the landowners’ business operations on the site from which a part is taken.
State Department of Highways v. Constant, supra at 706.
It has been noted that the jurisprudence has limited awards of replacement value to situations in which the property was indispensable to the expropriatee’s business such that an award constituting merely the market value of the property would likely have caused the defendants to lose their business. State, Department of Transportation and Development v. Lobel, supra (reviewing State Department of Highways v. Constant, supra; City of Shreveport v. Standard Printing Company of Shreveport, Inc., 427 So.2d 1304 (La.App. 2d Cir.), writ denied, 434 So.2d 1106 (La.), writ granted, 435 So.2d 426 (La.), writ recalled, 441 So.2d 737 (La.1983); and Monroe Redevelopment Agency v. Kusin, 398 So.2d 1159 (La.App. 2d Cir.1981), writ denied, 405 So.2d 530 (La.1981)). Clearly, it must be shown that the uniqueness and indispensability of the expropriated property would render it more valuable to the expropriatee than it would be to the average buyer. In such a case, the market value of the property would inadequately compensate the defendant and, based on his unique, indispensable need for the property, would place the defendant in a worse pecuniary position than he had been in before the taking. See State, Department of Transportation and Development v. Lobel, supra.
In the instant case, we find ample support for the trial court’s determination that the evidence failed to show the uniqueness and indispensability of the expropriated property such that awarding Mr. Griffith the market value, rather than replacement value, would likely have resulted in substantial injury to his business.
Initially, we note that there was no indication that the location of the expropriated property was unique or indispensably related to the success of the business. Mr. Griffith admitted that his carpet cleaning business is not limited to the Shreveport area, its customers live throughout the geographic region known as the Ark-La-Tex.[4] The nature of Mr. Griffith’s business would also indicate that the location of the business is relatively unimportant to its success. As explained, customers generally did not visit the business, rather, Tri-State collected the rugs and carpets from the homes of its customers, returned to the business to perform the necessary work and then delivered the carpets back to the *633 customer. The Dillman Avenue location was clearly neither unique nor indispensable to Tri-State’s business.
The factors espoused by Mr. Griffith as to the alleged unique nature of the expropriated property likewise fail to show the indispensability of that property to TriState’s business success. Mr. Griffith notes that the Dillman Avenue location has been periodically upgraded and modified to satisfy his business needs since he bought the property in 1952. However, Mr. Griffith testified that the only specialized needs of the business are poles on which to dry the rugs and sufficient open space in which to dry and store the rugs. In conjunction with the rug poles, it is argued that a further necessity of the business is buildings with roofs sufficiently strong to hold up the rugs on the poles. While the rug poles may themselves be indispensable to Tri-State’s business, they are clearly not unique to the expropriated property. These rug poles are movable and were so removed from the Dillman Avenue location and transferred to the newly leased premises.
The necessity of a sturdy roof is undisputed. However, there is no evidence that the roof on the Dillman Avenue location was stronger than roofs on comparable industrial buildings. Mr. McNew, the only expert who appears to have considered the roofs of possible replacement properties, only specifically noted one comparable property as having sufficient roof strength to support the rugs and rug poles. However, we refuse to consider his failure to mention roof strengths of other properties to be a condemnation of their strength. On the contrary, as Mr. McNew clearly considered roof strength to be a necessary component of a replacement facility, coupled with his proposing various other properties as viable replacement facilities, it may be inferred that he implicitly found these replacement facilities to have roofs sturdy enough for Mr. Griffith’s business. There is no evidence from either Mr. Griffith or his expert, Mr. McCormick, that they had inspected the roofs of the possible replacement properties proposed by the state’s experts. In light of the inconclusive nature of this evidence, the trial court was not clearly wrong in failing to find the roof of the Dillman Avenue property to have been a unique feature of Mr. Griffith’s business.
The final component of Mr. Griffith’s Dillman Avenue property, which he claims was unique and essential to his business, is the overall space available to him, which enabled him to have sufficient area to wash, dry, and store the rugs, plus have office space, a display area, and a welding room. We note that the area designated as the northern warehouse at the Dillman Avenue location, approximately 3,400 square feet, was generally not utilized in the carpet cleaning business. Defendant’s own expert, Mr. McCormick, testified that the northern warehouse was only sporadically used to store furniture for his customers who had been flood or fire victims. Mr. Griffith himself explained the use of his entire facility for the carpet cleaning business, but conspicuously absent from his testimony is any mention of the northern warehouse. Thus, although Mr. Griffith claims that large amounts of space are indispensable to his business, it appears that almost 3,400 square feet of building at the Dillman Avenue location was unessential to the success of his business.
Ultimately, the issue of whether Mr. Griffith could obtain a replacement property of sufficient size for the amount of money found to be the market value of the expropriated property involved an assessment of expert testimony. Mr. McNew and Mr. Everett, the state’s experts, both listed several properties of comparable size which were within the range of reasonable market values assigned to the expropriated property. Defendant’s expert, Mr. McCormick, found no such comparably priced, comparably sized replacement properties. In expropriation proceedings, much discretion is accorded to the trier of fact. The trial court’s factual determinations as to the value of property and his evaluation of and assessment of the weight to be given to the testimony of expert witnesses will not be disturbed on review in the absence of manifest error. State, Department of *634 Transportation and Development v. Estate of Davis, 572 So.2d 39 (La.1990); State, Department of Transportation and Development v. Hammons, supra. The trial court made a reasonable credibility determination which we do not find to have been manifestly erroneous. We find no error in the trial court’s award of market value rather than replacement value.
Mr. Griffith finally argues that the trial court should have considered the existence of mortgages on the Dillman Avenue location. Apparently, the expropriated property was burdened with mortgages nearly to the extent of the market value of the property. Mr. Griffith argues that the amount awarded as compensation was barely sufficient to pay off the mortgages, leaving Mr. Griffith with very little liquidity with which to seek a replacement facility, thereby leaving him in a worse pecuniary position than he had been in prior to the expropriation.
The constitutional guarantee of compensation to the full extent of a landowner’s loss requires not only that the landowner receive no less than that amount, but it also insures that he receive no more than that amount. State Department of Highways v. Bitterwolf, 415 So.2d 196 (La.1982); State, Department of Transportation and Development v. Stumpf 519 So.2d 279 (La.App. 5th Cir.), writ denied, 520 So.2d 753 (La.1988).
In effect, Mr. Griffith seeks double compensation for the expropriated property. He argues that he should have the mortgages retired and also be awarded sufficient additional compensation to purchase a replacement property. Clearly, however, defendant’s proposed compensation would put him in a better financial position than he was in before the expropriation. At the time of the expropriation, Mr. Griffith had very little equity in his heavily mortgaged property. He now argues that he should be entitled to full equity in an analogous replacement property. The burden of obtaining financing for his replacement property must be borne by Mr. Griffith, not by the DOTD. See State, Department of Transportation and Development v. Hecker, 493 So.2d 125 (La.App. 5th Cir.), writs denied, 494 So.2d 325, 326 (La.1986).
Moreover, we can only speculate as to the reason this long-standing, apparently successful business has such a substantial mortgage. That obligation would not seem to be related to the value of the property.
The trial court did not err in refusing to consider defendant’s mortgages in determining compensation. For the above and foregoing reasons, the judgment appealed from is affirmed at appellant’s cost.
AFFIRMED.

. The Steel Erector's property was the subject of an unrelated expropriation suit which is not at issue in this appeal.

. Testimony revealed that these list prices were in excess of the actual market value of the properties, which would be revealed through sale negotiations. Additionally, although some of the proposed replacement properties were too expensive to be obtained solely with the market value awarded for the 5909 Dillman Avenue property, these costlier properties were of sufficient size to house both Tri-State Carpet Cleaners and Steel Erectors, Inc. and could be purchased within the combined amounts awarded for the expropriation of the two prior locations.

. Mr. Griffith concedes that if market value is the appropriate measure of compensation in this case, then the $130,000 sum determined by the trial court is a reasonable reflection of the market value of the expropriated property.

. The Ark-La-Tex is commonly understood to be comprised of southwest Arkansas, northwest Louisiana, and northeast Texas.