MOORE, J.
_JjThe State of Louisiana, Department of Transportation and Development, appeals a judgment condemning it to pay $914,181 as just compensation for a 2.669-acre strip of land expropriated to widen a highway in Caldwell Parish and for the closure of a cotton gin necessitated by the taking. Finding error in one portion of the district court’s calculation, we amend the judgment to $869,181 and the attorney fees to $145,000, but in all other respects affirm.

Factual and Procedural Background

In 2005, the state initiated a project to widen and improve U.S. Hwy. 165 through Columbia. It needed to expropriate four parcels of land, including 2.669 acres along *836 the base of a triangular 7.3-acre tract which Corey Gin Co. (“Corey”) had utilized as a cotton gin since 1953 under a 99-year lease. Neither the gin itself nor its accessory structures (other than one scale and an office space) were located on the land to be taken, but after the taking the new highway would run a mere 20 feet from the gin’s staging platform. Corey contended that without adequate space for rigs to enter, unload and exit safely, the business could no longer operate. The state countered that because of Corey’s limited capacity of about 10,000 bales per year and the market trend toward larger ginning facilities, Corey could not have remained in business.
Upon filing suit, the state tendered $305,109 as just compensation for Corey.[1] The state also hired consultants who proposed, over a year after the ^taking, a “cure” to reconfigure the staging area around the gin, pave much of the surface and replace the scale, whereby the gin could stay open. Corey and its own consultants, however, maintained that the cure was unfeasible and that the tender was inadequate. Corey demanded $1.5 million for the closure of the gin.
Prior to trial, the parties stipulated that the value of the expropriated land was $6,250 per acre. The issue for trial was just compensation for the improvements taken and any resultant damages.

Overview of Corey’s Evidence

The matter proceeded to a four-day trial in July 2006. Charles Rowland, Corey’s general manager and president, testified that Corey was built in 1953. Despite its corporate status, Corey was run as a cooperative for local cotton farmers. Most of its excess revenues were returned to farmers as rebates, and it did not charge its members for ginning. Even though Corey showed a profit in only two of its last five years of operation, during this time it had reduced a debt of $1.8 million incurred to purchase a nearby gin to $250,000. Although the ginning business had its “ups and downs,” Rowland had fully expected Corey to continue into the future. He described Corey’s layout and manner of operation, and specifically how the loss of over one-third of its land would make the business unsustainable. He had examined the state’s original and revised cures, but felt they did not leave enough space for a 70-foot rig to turn around.
Thomas A. Calloway II, a cotton farmer and gin manager in Ft. Necessity, testified that although Corey’s clientele was loyal and its facility pin excellent condition, it could not operate on the remaining small tract. Buddy Tanner, a gin operator in Frogmore, testified that no gin could possibly operate on 4V2 acres.
Tony Dollar, a gin appraiser from Killen, Alabama, testified that although he had no college degree or specialized training, he routinely applied a formula he had learned from his now-deceased mentor, Dick Day, to evaluate cotton gins. Based on this formula, any gin with a 10,000-bale annual capacity has an ongoing business value of $1.15 million, and Corey’s equipment had a replacement value of $287,500 in its current condition. He originally thought the equipment itself had been taken, but when advised that Corey still owned it, he estimated it had a salvage value of $60,000.
David Johnston, an expert in business valuation, testified that an asset-based analysis was most appropriate in this case; he disagreed that sales of other gins were truly comparable. Using Dollar’s $287,500 *837 figure for the equipment, Johnston testified that Corey’s value as an ongoing business was $1,150,000.
Gene Cope, a certified appraiser from Lafayette, testified that because of the tract’s shape and gin’s construction, Corey was a special design property which would be best valued by a cost approach. Accepting Tony Dollar’s estimate of the replacement cost of the machinery, he fixed the total replacement cost at between $1.4 and $1.7 million. After depreciation, he fixed total just compensation at $974,181 if Corey retains its lease on the remainder of the tract, and $1,180,700 if it loses its lease.

\ ¿Overview of the State’s Evidence

James L. Whitman, a cotton farmer and former gin manager in Rayville, testified that gins in Louisiana normally gin cotton for the seed, at no cost to the farmer, and actually pay a rebate to the farmer. Because of new varieties, however, gins are earning less from seed sales while other costs have risen. Because of these economics, six gins had closed in Richland Parish in recent years. He also testified that many farmers now carry their cotton to gin in shrink-wrapped modules, which hold more and travel farther, thus cutting the advantage of local gins. However, he was certain that a gin could survive on a smaller tract than Corey’s.
Charles Taylor Jr., a civil engineer from Monroe, testified that the taking removed a significant area of Corey’s operation, but that the state’s proposed cure would allow it to stay in business. The cure, which would cost $321,000, complied with all federal safety regulations, leaving sufficient room for an 18-wheeler or module truck to make a 360° turn. (Corey’s witnesses Rowland, Calloway and Tanner disagreed; during the hectic ginning season, a gin needed space enough for two cotton trailers to maneuver at the same time, and the proposed cure was simply too tight.)
Appraiser Billy Bratton of Alba, Texas, prepared a detailed appraisal. He fixed the replacement cost of Corey’s equipment at $258,000, but testified that on the date of taking it was worth $105,000.
Keats Everett, an appraiser from Monroe and adjunct professor at Louisiana Tech and University of Louisiana in Monroe, testified that he used a market data approach to evaluate the taken property. He found four | ¡^comparable sales of gins in the area between 1993 and 2005, concluding that the total value of Corey’s land, improvements and site improvements was $336,000.
The state’s expert in financial accounting, Michael E. Daigle of Covington, testified that an asset-based analysis was appropriate to evaluate a business like Corey, which did not turn a profit (he disagreed with Corey’s witness, Tony Dollar, who used a direct capitalization approach). He excluded cash receivables, vehicles, and other items not actually taken, and used Bratton’s estimate of the equipment value and Everett’s appraisal of land and improvements. He concluded that Corey’s total value was $370,000.

Action of the District Court

In written reasons for judgment, the court first stated the parties’ positions. It found that the cure proposed by the state would not restore Corey’s ability to operate. The court specifically cited the testimony of Corey’s general manager, Rowland, and of Calloway and Tanner, that the gin could not functionally and properly operate onsite after the taking. The court acknowledged that the state’s witnesses, specifically Charles Taylor, declared the cure safe and efficient, but noted that none of these had ever observed Corey in operation during the ginning season. The court then rejected the state’s contention that *838 Corey “wanted” to close because of its lack of profitability. The court found that with 50 years of operation, a good base of local cotton farmers, a highly specialized facility and well-maintained equipment, the gin would not have closed but for the taking.
| r,The court stated that under La. Const. Art. 1, § 4, the party from whom property is taken shall be “compensated to the full extent of his loss,” which is broader than the mere market value of the property taken and severance to the remainder; the owner must be put in as good a pecuniary position as if his property had not been taken. State v. Dietrich, 555 So.2d 1355 (La.1990); State v. Griffith, 585 So.2d 629 (La.App. 2 Cir.), writ denied, 589 So.2d 1055 (1991). For example, the owner is not limited to replacement cost but may receive lost profits. Monroe Redevelopment Agency v. Succession of Kusin, 398 So.2d 1159 (La.App. 2 Cir.), writ denied, 405 So.2d 530 (1981). In certain situations, replacement cost may be awarded without deduction for depreciation. City of Shreveport v. Standard Printing Co. of Shreveport, 427 So.2d 1304 (La.App. 2 Cir.), writ denied, 434 So.2d 1106 (1983). A lessee is also entitled to the full extent of his loss. State v. Dietrich, supra; Soma Enter. Inc. v. State, 584 So.2d 1243 (La.App. 2 Cir.), writ denied, 589 So.2d 1055 (1991). Finally, noting that the bulk of the evidence was expert testimony, the court cited its broad discretion in assessing expert opinions. State v. Bray, 511 So.2d 1300 (La.App. 2 Cir.), writ denied, 515 So.2d 446 (1987).
The court accepted Gene Cope’s appraisal as to just compensation, agreeing with his view that Corey was the quintessential special-use property. The court dismissed Keats Everett’s appraisal, which was based on comparable sales; Corey was unique, and not enough sales of gins occur to draw any reliable comparisons. The court included compensation for a trailer shed that Corey built off the leased premises and used for storage. |7The court accepted Cope’s lower estimate of $974,181, but without explanation granted a credit of $60,000 for salvage value of the equipment. The final award of $914,181 was subject to credit for the $305,109 deposit.
After a separate hearing in February 2007, the court stated that reasonable attorney fees were due, but not to exceed 25% of the difference between the award and the amount of the tender. The court awarded attorney fees of $170,000 and fixed expert witness fees. The state has appealed, raising six assignments of error.

Discussion: ‘Value in Use” vs. Market Value

By its first assignment of error, the state urges the court erred in accepting the opinion of Corey’s expert, Gene Cope, regarding the value of the land and improvements because he applied a “value in use” standard instead of the market value standard. The state contends that market value is the proper standard. La. R.S. 48:453 A; Exxon Pipeline Co. v. Hill, 2000-2535 (La.5/15/01), 788 So.2d 1154; State v. Schwegmann Westside Expy., 95-1261 (La.3/1/96), 669 So.2d 1172. The state concedes that value in use may be appropriate, but only when the property produces income, a factor which Cope did not consider. In fact, Corey’s income was negligible, as the gin was run as a cooperative with dividends going to producers, not shareholders. The state submits that its own expert, Keats Everett, was the only witness to apply the market value standard, and his calculation of $307,000 was the proper amount of compensation.
Corey responds that the standard of review is manifest error and the trier of fact has great discretion which expert’s opinion to accept. The | ^constitution requires com *839 pensation “to the full extent of his loss,” and thus is not limited to market value. State v. Griffith, supra, and citations therein. This jurisprudence requires the owner to be placed in the same financial position as if the property had not been taken. The court was entitled to find that Corey was “unique,” being the only remaining gin in Caldwell and Ouachita Parishes, and that the allegedly comparable gins mentioned by Everett were actually larger and newer. In short, the court was not plainly wrong to accept Cope’s methodology.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit. In every expropriation, a party has a right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss. La. Const. Art. 1, § 4(B).[2] The measure of damages, if any, to the defendant’s remaining property is determined on a basis of immediately before and immediately after the taking, taking into account the effects of the completion of the project in the manner proposed or planned. La. R.S. 48:453 B; State v. Schwegmann Westside Expy., supra. The owner is not limited to receiving just the market value of the taken property and severance damages to the remainder; he must be placed in as good a pecuniary position as he would have been had the property not been taken. State v. Dietrich, supra; State v. Griffith, supra. The determination of what amount will constitute the full extent of |9the owner’s loss depends on the facts of each case and the uniqueness of the thing taken. State v. Griffith, supra, and citations therein.
The district court candidly acknowledged that Corey’s lead expert, Cope, considered the gin “unique,” while the state’s lead expert, Everett, deemed it specialized but not unique. Supporting Cope’s view was Tom Calloway, an experienced gin manager who testified without contradiction that the concrete slab was customized to Corey’s needs. Calloway also testified that for its age, the facility was in exceptionally good condition, a point confirmed by both gin experts, Billy Bratton and Tony Dollar. Corey’s manager, Charles Rowland, testified without contradiction that Corey was the only surviving gin in Ouachita and Caldwell Parishes, in part because of its consolidation with or purchase of two nearby gins, and in part because of its customer base. These facts support the district court’s finding that Corey was sufficiently “unique” to warrant compensation greater than mere market value.
The state strongly urges that Cope’s “value in use” method cannot apply to a business like Corey which does not turn a profit. According to the financial statements, in its final five years of operation Corey showed an operating profit only one year ($22,844 in 2003); a net profit only two years, when operating losses were offset by the sale of assets; and net losses the other two years. Even with these apparently negative figures, however, Corey had always paid the standard rebates to its producers and had nearly retired a debt of $1.8 million from the purchase of Caldwell Gin. On this evidence, the district court was not plainly wrong to find that Corey did in 110fact make a profit and that Cope’s “value in use” methodology was suitable in determining just compensation. This assignment of error lacks merit.

*840
Cost Approach vs. Market Approach

By its second assignment of error, the state urges the court erred in accepting Cope’s opinion because he used only the cost approach to valuation; this involves depreciating the cost to build a new gin, which is not the accepted appraisal standard for older properties such as Corey. In support, it cites Exxon Pipeline Co. v. Hill, supra. Further, Cope’s appraisal was flawed because it was based only on his visual analysis of the gin, while Everett relied on actual market extraction of depreciation of gins. In fact, the state submits, a gin of Corey’s age and condition has virtually no market value, based on actual sales. In support, it cites a reference book, Real Estate Valuation in Litigation, 12th ed. (Chicago: Appraisal Inst., ©2001). It concludes that Cope’s analysis is tantamount to valuing a “well-preserved buggy-whip factory at a high figure, even though there is obviously no demand for buggy-whips.”
Corey responds that the state never offered the reference book into evidence, only attaching it to a post-trial brief, and it cannot be considered on appeal. Further, the state’s “comparable sales” were not really apposite, as Corey was virtually the most specialized property Cope had ever assessed. Finally, even Everett found no deferred maintenance, thus warranting Cope’s decision to depreciate the property only 50%.
Even on the cold record, the comparable sales adduced by Everett required too much adjustment to bear any relevance to Corey. Those gins In were 35 to 40 miles away and had significant nearby competition; they had varying parcels of land, and some had warehouses; one of the sales occurred in 1993, over 10 years before the instant taking. While we recognize the difficulty of extracting compara-bles in a dwindling market like ginning, we cannot say on this record that the district court was plainly wrong to find Everett’s market analysis not truly comparable.
To render a cost estimate, Cope testified that he used reports from the state’s engineer, Charles Taylor, and cost consultant, Ronnie Rabalais, who fixed the replacement cost at $1,669,355 and $1,446,736, respectively. He applied a 50% depreciation in light of his physical examination of the property and the unanimous testimony that Corey was in exceptional condition. Everett acknowledged that depreciation of older buildings is highly subjective, that Corey had no deferred maintenance, and he had never before appraised a cotton gin, but he applied a 76% rate based on his market extraction of comparables. The court expressly found Cope’s appraisal more reliable, a finding we cannot declare plainly wrong in light of the subjectivity of depreciation, the sufficiently “unique” features of Corey’s facility, and its overall condition. This assignment lacks merit.
Value of Gin Equipment
By its third assignment of error, the state urges the district court erred in accepting the opinion of Corey’s expert, Tony Dollar, as to the value of the gin equipment prior to the taking. Dollar valued the gin at $1.15 million, the equipment at $287,500, and the post-taking salvage at $60,000. However, the state submits that every one of Dollar’s assumptions was | iaunfounded, e.g., that Corey charged producers 8<t per pound for ginning, when in fact there was no charge. The state contends that Dollar “valued an imaginary gin, which cannot be compared to Corey Gin because Mr. Dollar did not take into account any attribute of Corey Gin itself.” Citing the financial statements, the state urges that its own expert, Billy Bratton, *841 accurately valued the equipment, post-taking, at $105,000.
Corey responds that two years prior to the taking, Bratton had appraised the equipment at roughly the same value as Dollar, $258,000. Further, because Corey could no longer operate as a gin, the equipment had nothing but salvage value.
In striking contrast to its other findings, the district court did not specifically attribute the salvage value to a particular witness, commenting only that the “best offer the court heard was $60,000.” Like the state, this court is greatly troubled by Dollar’s valuation technique, which he was totally unable to explain (and scarcely able to demonstrate on the stand),[3] and was discredited by the state’s CPA, Mike Daigle, for its failure to consider the actual operation of the business. The state also shows that most of Dollar’s assumptions were flawed. Nevertheless, even with these problems, Dollar’s appraisal of the equipment prior to taking was close enough to Bratton’s that the court was not plainly wrong to adopt it.
The same cannot be said, however, for Dollar’s estimate of salvage value. Critically, he had initially assumed that the equipment was subject to |isthe taking, when it fact it was not. He admitted having “no idea” what Corey’s equipment would be worth to a willing buyer, but “hoped” it would be worth at least $60,000. He suggested that the lint filters alone would sell for $15,000, but Rowland testified that he had already sold them for $20,000, 33% more than Dollar’s estimate. On these facts, we find an inadequate basis to accept Dollar’s appraisal of the salvage value.
By contrast, Bratton testified that before the taking, the equipment had a replacement cost of $258,000; deducting a reasonable cost to remove it from Corey’s facility and install it elsewhere, and for diminished demand for gin equipment in the current market, the post-taking value would be $105,000, whether or not the gin was running. The state’s CPA, Daigle, considered this methodology sound and adopted it in his report. We find that Bratton’s estimate is well supported by sound appraisal and accounting practices. The judgment will be amended to award the state a credit for that amount, $105,000. This assignment has merit.

Rejection of the Cure

By its fourth assignment, the state raises the alternative claim that the court erred in finding that the proposed cure would not work. The state contends that it presented specific analysis and study while Corey offered only unsupported and unspecific opinion that the cure would be too congested. The state cites the cure fashioned by its expert engineer, Charles Taylor, and its cotton gin expert, Jimmy Whitman, who felt that redesigning the layout would accommodate all vehicular traffic; only the yard had to be changed. The cost of the proposed cure was $321,000; together with the 114stipulated land value of $6,250 per acre, the total would be no greater than $369,843. The state contends that Rowland never seriously considered either proposed cure, thus supporting its suspicion that Corey wanted to close shop.
Corey responds that the issue is fact-intensive and the court did not abuse its discretion in finding the cure unworkable.
*842 Testimony concerning the state’s two proposed cures was perhaps the most detailed evidence in this long trial. Whitman, to his credit, labored for months, constantly revising the cure, but commented in several early drafts that 6-8 acres were needed “at minimum” or “for a convenient size,” much more than the 4V2 acres remaining after the taking. He also admitted that he never personally inspected Corey’s facility. Taylor was certain that the final proposed cure satisfied all FHA and insurance requirements and provided ample room for a module truck to make a 360° turn. He admitted, however, that in the cure, trucks would have to use at least one lane of the widened Hwy. 165 to negotiate the turn into the yard. He also assumed that at the height of ginning season, when some 30 trucks per day pulled into Corey’s yard, they would be evenly spaced at 2k per hour. To the contrary, all witnesses familiar with the actual operation of Corey testified that the situation was hectic during ginning season and that 20 feet of space between the highway and gin building was simply inadequate for a swarm of large, cumbersome trucks. This conclusion strikes us as intuitive. Finally, we see no reason to revisit the state’s contention that Corey always wanted to shut down anyway.
11sThe district court was not plainly wrong to reject the state’s final proposed cure. This assignment lacks merit.

The Shed Located Off the Leased Premises

By its fifth assignment of error, the state raises the alternative claim that the court committed legal error in compensating Corey $60,900 for an equipment shed which it did not own. The shed was built off-lease and Corey had no legal claim to it. The state contends it should not have to pay for something Corey did not even own. State v. Unverzagt, 590 So.2d 680 (La.App. 3 Cir.1991).
Corey concedes that it built the shed slightly off the lease and the owner of the property always allowed Corey to use it. Because the gin is now closed, the shed is of no value and Corey should be compensated for it. Further, Unverzagt does not actually prohibit this item of recovery.
The record supports the state’s assertion that the placement of the shed resulted from “innocent ignorance of the lease boundaries.” However, the record does not show that the owner, The McKeithen Trust, ever objected or demanded removal of the shed, thus distinguishing the case from Unverzagt, supra. Corey paid for the shed and used it freely.
The owner is not limited to receiving just the market value of the taken property and severance damages to the remainder; he must be placed in as good a pecuniary position as he would have been had the property not been taken. State v. Dietrich, supra; State v. Griffith, supra. On this record, to deny compensation for the shed would place Corey in a demonstrably worse pecuniary position than had the property not been taken. This | ^assignment lacks merit.

Attorney Fees

By its sixth assignment of error, the state contends that if this court should reduce the award of just compensation to Corey, it should also reduce the attorney fees to 25% of the final award over the $305,190 already deposited, in accordance with La. R.S. 48:453 E.
Corey responds that this is not a genuine assignment of error and that the $170,000 award was well within the 25% cap.
Reasonable attorney fees may be awarded if the amount of the compensation *843 deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney fees “in no event shall exceed twenty-five percent of the difference between the award and the amount deposited in the registry of the court.” La. R.S. 48:453 E; State v. Williamson, 91-2401 (La.4/20/92), 597 So.2d 439. Attorney fees should be calculated on the aggregate sum of the excess award and interest on that amount from the date title vested in the state until the date of payment. State v. Latiolais, 95-1441 (La.App. 3 Cir. 11/6/96), 690 So.2d 66, writs denied, 97-0138, 0169 (La.4/25/97), 692 So.2d 1082.
This court finds that counsel’s performance satisfies all the normal criteria for an award of attorney fees and supports a judgment for the full 25% of the difference under R.S. 48:453 E.[4] However, we are without 117discretion to exceed the statutory limit. City of Baton Rouge v. Johnca Properties LLC, 2003-0632 (La.App. 1 Cir. 2/23/04), 873 So.2d 693, writ denied, 2004-0696 (La.5/7/04), 872 So.2d 1083. The state deposited $305,190 into the court registry; by this opinion, the award is amended to $869,181. The difference is $563,991, of which 25% is $140,997.75. Allowing a reasonable amount for interest under State v. Latiolais, supra, we are constrained to reduce the attorney fees to the highest reasonable amount under R.S. 48:453 E. The attorney fees will therefore be amended to $145,000.

Conclusion

For the reasons expressed, the judgment is amended. It is ordered, adjudged and decreed that Corey Gin Co. have judgment and recover against the plaintiff, the State of Louisiana, Department of Transportation and Development, in the amount of $869,181, subject to a credit of $305,190, plus legal interest until paid, together with judgment against the plaintiff in the amount of $145,000, for statutory attorney fees under La. R.S. 48:453 E. The judgment is in all other respects affirmed.
Appellate costs which the state was not required to advance are not assessed. La. R.S. 13:4521.
AMENDED AND AFFIRMED.

. The total deposit was $319,901, of which a portion was allocated to the other defendants, The McKeithen Trust (Corey's lessor) and Rucker's Custom Cabinets (Corey’s subles-see). These parties settled with the state and are not involved in the appeal.

. A subsequent amendment redesignated these provisions as La. Const. Art. 1, § 4(B)(1) and 4(B)(5), without substantive change to these particular passages. La. Acts.2006, No. 853, § 1, effective October 10, 2006.

. For example, Dollar testified that he applied a 50% "expense deduction” to income from gin fees (which Corey did not collect), but not to income from compression and seed; when asked why the expense deduction would not apply to all sources of income, he had no explanation, but said that his result would be the same whether or not he applied the deduction across the board.

. Factors include (1) the ultimate result obtained, (2) the responsibility incurred, (3) the importance of the litigation, (4) amount of money involved, (5) extent and character of the work performed, (6) legal knowledge, attainment and skill of the attorneys, (7) number of appearances made, (8) intricacies of the facts involved, (9) diligence and skill of counsel, and (10) the court's own knowledge. State v. Williamson, supra.