618 So.2d 1166 (1993)
PACKARD'S WESTERN STORE, INC., Plaintiff-Appellee,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 24677-CA.
Court of Appeal of Louisiana, Second Circuit.
May 5, 1993.
Rehearing Denied June 17, 1993.
*1168 Bertrand & Soileau by Ronald J. Bertrand, Rayne, for defendant-appellant.
Smitherman, Lunn, Chastain & Hill by W. James Hill, III and Donald Lee Brice, Jr., Shreveport, for plaintiff-appellee.
Before MARVIN, C.J., and LINDSAY and HIGHTOWER, JJ.
MARVIN, Chief Judge.
In this action by a shopping center tenant against the State, DOTD, who effectively expropriated the shopping center property by purchasing it from the owner for inclusion in the I-49 right-of-way, the State appeals a judgment based on a jury verdict that awarded the tenant over $700,000 for its "losses" as a result of the taking, plus $170,000 attorney fees which were taxed as costs.
The State complains of the jury charges and the jury's awards. The former tenant in the shopping center, Packard's Western Store, Inc., answered the appeal seeking an increase in attorney fees for services on the appeal and claiming that legal interest should be awarded on the court costs, including the expert witness and attorney fees.
We amend the judgment to reduce the award from $733,417 to $644,750 and to have the legal interest on the costs, including the trial court's award of the attorney and expert witness fees, run from the date of the trial court judgment as suggested by Cajun Electric Power Coop. v. Owens-Corning Fiberglass Corp., 616 So.2d 645 (La.1993).
We further amend to increase the attorney fee award with legal interest on the increase from the date of this opinion. As amended, the judgment is affirmed.

FACTS
The corporate plaintiff, Packard's, a retail store selling western apparel and boots, was owned and operated by Ivan Packard, Jr., who first opened the store in downtown Shreveport in the 1940's. After leasing space in various locations for about 30 *1169 years, Packard's moved in 1975 into the Harrison Shopping Center, located in a mixed residential and commercial area, at the intersection of Southern Avenue and Kings Highway, south of downtown Shreveport. These streets were heavily traveled, affording easy access to the shopping center.
One of the corridors that was being considered for the I-49 right-of-way in 1980 paralleled Southern Avenue in the area of the shopping center. That corridor was ultimately chosen in 1983. The State purchased the shopping center in April 1986.
In November 1980, Packard's and other businesses in the area were first notified that the State may select that corridor for I-49 and were invited to attend a public meeting in December 1980. The letter giving notice of the meeting also said: "The Louisiana Department of Transportation and Development, Office of Highways, will want to buy your business ... if your business is within the right-of-way."
Mr. Packard attended the public meeting in December 1980 and another in February 1983. At each meeting, Packard's was given a brochure from the State explaining "relocation assistance" benefits and stating:
DO NOT MOVE OR PURCHASE REPLACEMENT HOUSING UNTIL YOU HAVE BEEN SPECIFICALLY AUTHORIZED TO DO SO BY [DOTD]. YOU COULD LOSE ALL POSSIBLE BENEFITS PROVIDED BY THE RELOCATION ASSISTANCE PROGRAM.
The substance of this notice was repeated to Packard's in letters from and conversations with DOTD personnel, some as late as February 1986, about two months before the "taking" by the purchase of the property. Packard's was told that it would lose "all possible relocation benefits" either by moving to a new location before the State acquired the property from the landowner or by moving the business to an existing second location.
In the light of these admonitions, Packard's remained in the shopping center, and elected not to build a replacement facility on a vacant commercial lot that Mr. Packard had purchased about nine months before Packard's received the first notice of the intended taking for I-49 construction in 1980. The time necessary to construct a building on the lot was estimated at 6-12 months.
In 1975 Packard's leased 4,423 square feet in the shopping center. In 1981, after receiving the initial notice from DOTD but before the exact location of I-49 was announced, Packard's doubled its occupancy space in the shopping center to 8,832 sq. ft., using half of the store for an open display of over 4,000 pairs of boots.
At the February 1983 public meeting, the State announced that I-49 would be constructed in the corridor that included the shopping center property. Property owners were told that the State estimated that property acquisitions would begin in the summer of 1983 and that construction would begin in 1984.
In 1983 Packard's began seeking a replacement rental site but found only sites with substantially less space at considerably higher rents. Thereafter Packard's began reducing its inventory by ordering less merchandise than usual in the spring of 1983, in anticipation of the taking. Packard's had learned by experience that it generally took 12-24 months to receive and sell merchandise after it was ordered. Packard's also ceased ordering merchandise six or more months in advance as it had previously done. Packard's hoped to avoid having merchandise delivered to it without a time and a place to display and sell it by placing its orders only one to three months in advance of delivery. This practice of ordering "late" caused Packard's to lose "early bird" discounts from some suppliers, thereby increasing Packard's "cost" and reducing Packard's profit margin to remain competitive. Packard's profits began declining in 1984.
Having heard nothing from DOTD for most of 1984, Mr. Packard sought a status report from the local DOTD office in November of that year. He was told that the State would probably not acquire the shopping center before early 1986 and that Packard's would have at least 90 days to *1170 move after being formally notified of the State's acquisition.
Packard's continued to decrease its inventory in 1985, ordering less and reducing prices on existing inventory. Mr. Packard explained that this was done, not because he intended to liquidate the business, but because of the uncertainty about when and where relocation might be feasible.
After 1975 Packard's extended its lease in the shopping center several times, usually for a term of three or four years. Packard's and its landlord, by agreement beginning in September 1985, extended the lease every six months because of the impending expropriation. Packard's base rent was increased by 70 percent when the short-term extensions began.
The last six-month extension began in March 1986 and would have run through August but for the taking on April 1, 1986. The State notified Packard's of the taking on April 3, 1986. Packard's remained in the shopping center after the taking, paying the rent to the State for five months after the taking. On September 22, 1986, Packard's moved out of the shopping center and ceased doing business.
In February 1986, the State told Packard's that it was entitled to no more than $10,000 for its losses resulting from the taking, this being the maximum amount of statutory relocation benefits payable to a business tenant who does not relocate its business under the Uniform Relocation Assistance Act, LRS 38:3101 et seq. When Mr. Packard produced the November 1980 letter containing the State's offer to "buy the business" he was told that that offer had been "rescinded." The State's witnesses admitted at trial that that offer "misrepresented the facts" and was "a very poor choice of words." The State began seeking a replacement site suitable for Packard's in early 1986 but without success.
DOTD's local right-of-way agent, Joe Dean, kept notes of each contact he had with Packard's, as required by law. Dean's notes of March 10, 1986 state:
Talked with Mr. Packard and his son at the store. We discussed relocation. Advised him of moving cost and methods of moving, the in lieu of payment [not to exceed $10,000], right to appeal our calculations, the department non-discrimination policy. He wants to consider a[n] in lieu of payment and wanted to know the time span. He stated he has already lost thousands due to not being able to buy new merchandise and [losing] discounts [on early orders]. He stated he may be put out of business due to increase in lease so he doesn't want to order too much. (Our brackets.)
In April 1986, Packard's gave DOTD copies of its inventory records showing that the value of its inventory had steadily declined from $256,000 in 1983 to $184,000 in 1984 and to $131,000 in 1985. Packard's attributed the decline in inventory and the corresponding decline in sales and profits to the impending expropriation. Dean denied Packard's testimony that Dean told him the "in lieu of" payment could possibly exceed $10,000. DOTD ultimately offered Packard's only $10,000, maintaining that this was the most that Packard's could legally recover. Packard's refused the offer and elected to close the business rather than relocating it.
In December 1986, Packard's brought its action seeking constitutional compensation for the taking and damages for losses that allegedly arose from the State's actions before the taking (rescinding its offer to "buy the business," delaying property acquisitions for several years, telling Packard's not to move until the property was acquired from the landowner, offering little assistance to locate a replacement site, and telling Packard's that it could recover no more than $10,000 for its losses).
The jury found that Packard's was entitled to compensation for the taking in these amounts:

Loss of value of business $396,000
Loss of past profits 168,333
Loss of fixtures and leasehold
improvements 7,500
Moving expenses/expenses
in lieu of moving 12,000

*1171 The jury also found that the State negligently misrepresented "facts" upon which Packard's relied to its detriment. The jury's itemization of Packard's damages for the negligent misrepresentation included the above amounts for loss of value of business, loss of past profits and loss of fixtures and leasehold improvements, plus $70,417 for loss of future profits and $79,167 for loss of leasehold advantage. The amounts that appeared in both categories were not duplicated in the judgment.

TWO THEORIES OF RECOVERY?
The jury was instructed that Packard's
seeks recovery of damages from the State on two theories. The first theory is that property of [Packard's] has been taken or damaged by the State. Our constitution provides that property shall not be taken or damaged by the State or its political subdivisions except for public purposes and with just compensation paid to the owner. The owner must be compensated to the full extent of his loss. The purpose of this law is to place the plaintiff in as good a position pecuniarily as he would have been had his property not been taken or damaged. The determination of what amount will compensate the owner of a property right to the full extent of his loss must be made on the basis of the facts of each case and in accord with the uniqueness of the thing taken....
The second theory of recovery asserted by [Packard's] is that Packard's is entitled to recover damages from the State because of the representations made by the State. In order to prevail on this theory, the plaintiff must prove the following:
1) that the state was negligent or did not use reasonable care in making representations to Packard's;
2) that Packard's relied to its detriment upon the representations made by the state;
3) that Packard's was reasonable in its reliance on the representations made by the State.
In order to determine if a party has been "reasonable" in their actions, you should consider whether they have acted as an ordinary prudent person would have acted under the circumstances.
The jury was instructed not to award punitive or speculative damages and to base any awards on the evidence, not on passion, prejudice or sympathy.
The jury verdict form required the jury to make separate factual findings and assessments of damages under each theory of recovery. Items of damages that appeared under both theories were not duplicated in the judgment.
The State objected to the references to tort recovery in the jury charge and verdict form on the grounds that the only basis for recovery was under the constitutional and statutory law applicable to expropriation. The court overruled the objection.
The State repeats its argument about the jury charge and verdict form here, claiming that the trial court's references to the tort theory of recovery may have instilled in the jury that the State had possibly "done something wrong," for which it should be punished. The State argues for the first time on appeal that the testimony about the State's actions before the taking was irrelevant. We do not address the relevancy argument because the State did not object to this testimony during the trial. LCE Art. 103 A(1); State, DOTD v. Crawford Business Trusts, 538 So.2d 1078 (La. App.3d Cir.1989), writ denied.
We need not and do not squarely answer whether the trial court erred in instructing the jury that Packard's could recover for the State's negligence as an alternative theory of recovery to the right to constitutional compensation. The court correctly charged the jury on Packard's right to compensation and on the measure of that compensation under LSA-Const. Art. 1, § 4, which provides in part:

*1172 Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit.... [T]he owner shall be compensated to the full extent of his loss.
The term "property" encompasses both tangible property and intangible property rights, such as the lessee's leasehold interest, even if unrecorded, and the landowner's right to develop his property. State Dept. of Transp. & Development v. Jacob, 483 So.2d 592 (La.1986); State through DOTD v. Chambers Inv. Co., 595 So.2d 598 (La.1992).
Property is "taken" when the State acquires it for a public purpose, whether by amicable purchase from the owner or by an expropriation action. Soma Enterprises v. State, D.O.T. & Dev., 521 So.2d 829 (La. App.2d Cir.1988), writ denied.
Property is "damaged" when the action or inaction of the State, in the exercise of its power to acquire property for a public purpose, diminishes the value of the tangible property or the intangible property right. Soma, supra; Columbia Gulf Transmission Company v. Hoyt, 215 So.2d 114 (La.1968); State, Dept. of Transp. v. Maynard, 565 So.2d 532 (La. App. 4th Cir.1990), writ denied. "Damage" to an intangible property right that occurs before the tangible property is taken is compensable upon proof that the State's action or inaction caused the damage. See and compare Maynard, supra, and State DOTD v. Brookhollow of Alexandria, 578 So.2d 558 (La.App.3d Cir.1991), writ denied.
Under the 1974 constitution mandating compensation to "the full extent of [the] loss," a property owner must be put in as good a position pecuniarily as he would have been had his property not been taken or damaged. The State must compensate him for the loss he sustains because of the taking. This loss includes business losses. State through Dept. of Highways v. Constant, 369 So.2d 699 (La. 1979).
A lessee's business losses, if proved to have been caused by the State's taking or damaging of property, are compensable under the "full extent of the loss" measure of recovery. Constant, supra; Holland v. State, Dept. of Transp., 554 So.2d 727 (La. App.2d Cir.1989), writ denied; State, Dept. of Transp. & Dev. v. Exxon Corp., 430 So.2d 1191 (La.App. 1st Cir.1983), writ denied.
The terms by which the right to and scope of constitutional compensation are determined are broad enough to encompass Packard's claim that the value of its business and its business profits were "damaged" by the State's actions before the taking, notwithstanding the State's assertion that the State "took" only the shopping center and not Packard's business.
The constitutional measure of recovery (full extent of the loss) is broader than the measure of tort recovery for negligent conduct (actual and reasonably foreseeable damages). See Peacock's, Inc. v. Shreveport Alarm Co., 510 So.2d 387, 407 (La. App.2d Cir.1987), writ denied. The two awards that the jury made solely under the tort theory, loss of future profits and loss of leasehold advantage, represent losses that are compensable under the constitution if they are shown to be causally related to the State's taking or damaging of property. State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990); State, Department of Highways v. LeBlanc, 319 So.2d 817 (La.App. 1st Cir.1975).
The fact that the jury's awards were less than the amounts testified to by Packard's experts, belies the State's contention or concern that the charges on tort recovery may have caused the jury to attempt to "punish" the State rather than limiting its considerations to a fair and impartial assessment of the evidence. The jury was told not to award punitive or speculative damages.
In light of the evidence that the jury heard and the broad measure of constitutional compensation that is available without proof of fault or negligence, about which the jury was correctly charged, we *1173 find that any assumed error in the trial court's superfluous instruction on a tort theory of recovery was harmless error and did not prejudice the State. The jury charges were not so incorrect or inadequate as to preclude the jury from reaching a verdict based on the constitutional "full extent of [the] loss." Compare Laborde v. Velsicol Chemical Corp., 474 So.2d 1320 (La.App.3d Cir.1985), writ denied.

LOSS OF PROFITS
The jury awarded Packard's $168,333 in lost past profits, obviously for the years 1984-1986, and $70,417 in lost future profits, apparently for some period beyond 1986.[1] The State claims these losses were not caused by the State's actions and argues that no award should have been made for lost profits after August 1986, when Packard's last lease with the shopping center owner would have expired.
The State contends, as it did below, that a lessee may not legally recover business losses beyond the term of its lease. The State argues that the trial court erred in instructing the jury that losses beyond the lease term could be awarded if Packard's "has proved by a preponderance of the evidence that it had an option or guarantee that [its] lease would have been renewed."
Jury Charge
The trial court based the instruction on Holland v. State, Dept. of Transp., supra, wherein we said:
The trial court awarded Holland $102,791 for his business loss for the lease term that ended December 31, 1987 [about 2½ years after the taking].... The court found Holland's claim for business loss after 1987 to be speculative because Holland had no option or guarantee that his lease would have been renewed. Holland has not appealed or answered the appeal to increase the award.
554 So.2d at 732; our brackets.
The State correctly acknowledges that the issue whether a lessee may recover business losses beyond the lease term based on an option or guarantee of lease renewal was not before us in Holland because Holland did not seek to have the business loss award increased on appeal. Other cases are cited wherein appellate courts have addressed and affirmed the denial of lost profits beyond the lease term: State, Dept. of Transp. & Dev. v. Exxon Corp., supra; State, Dept. of Transp. & Dev. v. Pipes, 489 So.2d 293 (La.App. 4th Cir.1986), writ denied; Naquin v. Dept. of Transp. and Dev., 604 So.2d 62 (La.App. 1st Cir.1992), writ denied.
Packard's cites cases where future economic losses were awarded as constitutional compensation: Dietrich, supra (lost business income before and after trial); Maynard, supra (loss of right to market or develop property, before and after a portion was taken); Brookhollow, supra (loss of right to develop property after, but not before, a portion was taken). The State claims these cases do not avail Packard's because each involved economic losses of a landowner rather than a tenant.
Packard's argues that a tenant should be allowed to recover business losses beyond the expiration of the lease term if the evidence shows more probably than not that the lease would have been extended for a longer term but for the expropriation.
While it is true that a business lessee's right to possess the property depends on the existence of a lease, where the landowner's does not, we decline to say that a lessee may never recover business losses beyond the expiration of the lease term, particularly when, as here, the impending expropriation is found to be the sole reason for shortening what would otherwise have been a longer lease term in a well-established and mutually satisfactory lessor-lessee relationship.
The evidence here showed that Packard's had a four-year lease, from July 31, 1981 through July 30, 1985, which the shopping center initially offered to extend for three more years, to July 30, 1988. The shopping *1174 center made the offer to extend in September 1983, before it learned of the exact corridor for I-49. The shopping center and Packard's thereafter agreed that lease extensions after July 30, 1985, should only be for six months.
Carol Podany, the leasing agent who represented the shopping center owner, testified that Packard's
was an extreme asset to the property. It was an older property and yet he had a very good business. He brought in a lot of people into the area, which of course helped all of the tenants that were located in the property. He was always timely with his rent payments. You could almost count on a rent payment at least five to seven days ahead of the first of the month, which is very unusual in this business. But he was a very, very good tenant.
In addition to the base rent, Packard's leases required Packard's to pay an additional or override rental payment based on a percentage of its annual gross sales in excess of a stated amount, which in the 1981-1985 lease was $500,000. Ms. Podany said that Packard's always achieved high enough gross sales to trigger the rent override payments during her dealings with Packard's from 1981-1986. Ms. Podany testified that Packard's lease would have been extended for a term of 3-5 years "but for ... the fact that I-49 was coming through the Harrison Shopping Center property."
The State notes that similar circumstances were presented in Exxon, supra, where a lessee was allowed to recover business losses through the end of the last verbal lease extension (April 1981) but not beyond that date, notwithstanding evidence that the lessor had previously offered the lessee a longer lease (through August 1982), which was not executed because of the impending highway construction.
The lessee in Exxon did not limit her claim for business losses to August 1982, the end of the lease that was offered but not executed, but instead claimed business losses "for the economic life of the [gas] station or [the lessee's] work life expectancy." 430 So.2d at 1195. The lessee chose to end her relationship with the lessor even after the lessor offered her a choice of alternate locations for her business. 430 So.2d at 1196.
In light of the evidence quantifying Packard's lost profits, which we shall discuss below, the $70,417 award for future losses cannot be deemed to extend beyond 1988, the reasonable time, based on this record, to which we find that the shopping center would have extended Packard's lease but for the taking. Packard's was not offered an alternate location by the shopping center. The State did not attempt to show that it suggested other locations, suitable or unsuitable to Packard's.
On this record, and in light of the principles allowing recovery of business losses shown to have been caused by the State's taking or damaging of property, discussed and cited above, we find no error in the jury charge that Packard's could recover business losses after the expiration of its lease upon proof by a preponderance of the evidence that Packard's had an option or reasonable expectation that its lease would have been renewed for some reasonable time period.
Proof of Lost Profits
Packard's economist, Dr. Melvin Harju, estimated Packard's lost profits by comparing the average of its profits from 1980-1983, or $186,911, with its profits for the years 1984-1986: $35,065 (1984), $92,966 (1985), and $35,304 (1986). According to these calculations, Packard's lost $151,846 in 1984, $93,945 in 1985 and $151,407 in 1986, for a total of $397,198 over the three-year period. Dr. Harju opined that about half of these losses were caused by Packard's reduction in inventory, in response to the uncertainty about when the taking would occur and where the business would be located thereafter. Dr. Harju attributed the other half of the losses to the downturn in the local economy in the mid-1980's, which affected all businesses in the area.
The State presented no expert evidence. Cross-examining Dr. Harju and other Packard's witnesses about the "urban cowboy craze" which occurred in the early 1980's to *1175 boost sales of western wear across the nation, the State suggested that at least some of the decline in Packard's profits after 1983 was due to the passing of the "craze." Dr. Harju opined that the effect of that trend increased Packard's sales somewhat during the early 1980's but noted that western wear is and has been popular in the Shreveport area before and since that time, compared with cities such as Chicago or New York where the popularity of western wear was simply a "passing fad."
Dr. Harju opined that Packard's would have maintained its 1980-1983 average earnings of $186,911 through the time of trial in 1991, but for I-49. Dr. Harju attributed Packard's decision to close the business in 1986 to a number of factors, including Mr. Packard's age that year (66), the economic conditions at that time, the lack of a suitable alternate location, and the uncertainties about what the State would pay for Packard's losses. Dr. Harju deemed Mr. Packard's decision to close the corporate business to be reasonable under the circumstances then existing.
The jury obviously found that some, but not all, of Packard's lost profits through 1986, as explained by Dr. Harju, were caused by the State's actions. This finding is not clearly wrong. The jury's award of $168,333 for lost past profits is less than half of Dr. Harju's estimate of Packard's losses from 1984-1986 ($397,198).
The jury could have also reasoned that Packard's would have continued to suffer losses after 1986 if it had not gone out of business, and that the State's actions before the taking contributed to Mr. Packard's decision to close the business. Such findings would not be found clearly wrong. The award of $168,333 for past losses represents losses of $56,111 per year for three years. The $70,417 award for lost future profits represents about 1¼ year's loss after 1986. This award is reasonable in light of the evidence that Packard's reasonably could have remained in the shopping center through July 1988 but for the taking.

LOST VALUE OF BUSINESS
The jury awarded $396,000 for the lost value of Packard's business. The State argues that no award should be made for this loss because the State did not "take" the business, but only the shopping center where the business was located.
The constitution requires the State to pay compensation for property that is "taken or damaged" for a public purpose. Art. 1, § 4, quoted supra. In light of the broad definitions of the terms "property" and "damaged," stated above, we conclude that Packard's business constitutes "property" and that the decline in its value is compensable upon proof that the State's action or inaction caused the decline, or "damaged" the property.
The State argues that it did not cause any decline in Packard's business value because Packard's could have relocated its business, as many others affected by I-49 did, but simply chose not to relocate. The jury heard evidence, which we have summarized, from which it obviously found that Mr. Packard's "choice" to close the business was made only after the State repeatedly told him not to move until the State acquired the shopping center from the lessor-owner, and that a suitable replacement site was not then available. The jury also heard evidence that Mr. Packard was an excellent business manager who had successfully relocated his business in the past, knowing when and where the relocation would occur and making inventory adjustments accordingly. The jury's finding that the State's action or inaction caused or contributed to Mr. Packard's decision to close the business rather than relocate it is not clearly wrong.
Dr. Harju calculated the lost value of the business as $934,892, the difference between Dr. Harju's assessment of its 1983 value, $1,080,624, and its 1986 liquidation value of $145,732. The 1983 value represents the amount of capital necessary to generate an average of $121,411 in annual profits to the business owner, at an annual rate of return of 16 percent. Packard's generated this average profit from 1980-1983 *1176 ($186,911 less $65,500 in salary to the business managers).
Dr. Harju opined that an investor would have paid $1,080,624 for the business in 1983 and that the business would have held its value thereafter, even up to the time of trial in 1991, notwithstanding the economic downturn in the mid-1980's, had Packard's not been faced with the I-49 relocation dilemma. Dr. Harju allocated all of the loss in business value to I-49, without reducing the amount by 50 percent as he did for Packard's lost profits, opining that the business was strong enough to have successfully weathered the economic decline without closing had it not been for I-49. The jury's award of $396,000, which is less than half of Dr. Harju's loss assessment of $934,892, is supported by the evidence and is not an abuse of discretion.
The State contends the awards for lost business value and lost profits constitute double recovery for the same losses. Dr. Harju testified that the awards were not duplicative of one another because Packard's lost both the income that it had previously earned from the business and the business itself, which had generated the income. On this record, we cannot say that the awards constitute double recovery.

LOSS OF LEASEHOLD ADVANTAGE
The jury awarded $79,167 for loss of leasehold advantage. A lessee enjoys a leasehold advantage when its contractual rent is less than what the property would bring on the rental market at the time of the taking. Soma Enterprises v. State, DOTD, 584 So.2d 1243 (La.App.2d Cir. 1991), writ denied; LeBlanc, supra.
Packard's real estate appraiser, James Young, defined the term "leasehold advantage" for the jury: "when you have a contract rent that is below ... what people would normally pay for that type of facility." Young said, however, that he did not attempt to, and could not, determine whether Packard's enjoyed a leasehold advantage at the shopping center because Packard's
was in an area that has had conflict now from about 1980 forward because of Interstate 49. I don't know that I can center in and say [its] rent was above or below market because whoever was in that location knew that they were going to have to relocate.
Young limited his testimony to an assessment of how much more rent Packard's would have been required to pay in other areas of Shreveport than it was paying at the shopping center in 1986. Young candidly stated, "This is not a leasehold advantage valuation problem. This is an alternate rent location where one could acquire replacement square foot area and what would be encountered in that respect."
According to Young, the alternate sites he assessed were not truly comparable to Packard's space in the shopping center, and some sites were not available in 1986. In any event, Packard's did not incur any losses by paying higher rent because it did not relocate.
The evidence in this record does not support any award for loss of leasehold advantage. We shall amend the judgment to delete that award. See and compare Soma, supra, 584 So.2d at 1247.

LOSS OF FIXTURES AND IMPROVEMENTS
Packard's claimed $10,000 for the loss of these fixtures and improvements that it had installed in the shopping center: burglar bars, carpeting, doorway openings, additional lights, alarm system, rails, counters and a 7½ ton air conditioner.
Packard's had agreed in its various leases with the shopping center that
All alterations, additions, improvements and fixtures (other than unattached, movable trade fixtures) ... made or installed by [Packard's] ... shall remain upon and be surrendered with the premises and become the property of Landlord at the termination of this lease, unless Landlord requests their removal in which event Tenant shall remove the same and restore the premises to their original condition at Tenant's expense. Any attached fixtures installed by Tenant may be removed by Tenant, and Tenant shall *1177 restore the premises to their original condition.
Many of the fixtures and improvements for which Packard's sought recovery from the State appear to be items that Packard's was obligated to surrender to the shopping center owner when the lease terminated by the State's acquisition of the property. Any compensation owed by the State for these surrendered items was owned to the lessor-owner, not to Packard's. Packard's did not show at trial which, if any, of the listed items were removed before the taking, or whether Packard's was able to sell any items that may have been removed when it liquidated the business.
On this record, no award should have been made for loss of fixtures and improvements.

MOVING EXPENSES/EXPENSES IN LIEU OF MOVING
The jury awarded $12,000 for Packard's moving expenses/expenses in lieu of moving. The State asks that the award be reduced to $10,000, the maximum amount that the State must pay to a business that does not relocate in lieu of paying its actual moving expenses under the Uniform Relocation Assistance Act, LRS 38:3101 et seq. (URAA). The State also argues that the $10,000 should be credited against any award for lost profits or lost value of business.
The jury was given these instructions on the URAA:
An owner of a discontinued or relocated business is entitled to recover actual moving costs or, in lieu of moving cost, a payment equal to its average annual net earnings. This payment cannot be less than $2,500 or more than $10,000....
Additionally, the Uniform Relocation Assistance Act establishes a uniform policy for the fair and equitable treatment of persons displaced as a result of federal and federally assisted programs in order that said persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole. Any benefits due under the Uniform ... Act are in addition to those awards which may be due as just compensation under the Louisiana Constitution for taking of or damage to property.
The jury's $12,000 award for Packard's expenses in lieu of moving clearly exceeds the $10,000 statutory maximum under § 3104 C. We shall reduce the award to $10,000.
Packard's contends we should not review the State's claim for a credit of this amount against other awards because the State did not object to the jury charge stating that the statutory benefits are owed in addition to constitutional compensation. The State is not complaining of the jury charge per se, but is arguing that the "in lieu of" award duplicates a portion of other awards.
We are unable to determine whether the State sought the credit in the trial court, perhaps in its motion for judgment NOV or motion for new trial, both of which were denied, because the grounds for these motions do not appear in the appellate record.
The State, citing Holland, supra, notes that the trial court there reduced the lessee's award for business losses by $10,000, "credit[ing] the State with ... the amount it paid Holland `in lieu of moving expenses' after he left the Kings Highway [service] station ..." 554 So.2d at 733. Holland, like Packard's, did not relocate the business. Holland did not appeal or answer the appeal to challenge the credit.
We look to the URAA to determine whether the payment in lieu of moving expenses duplicates other awards. Section 3104 A requires the State to pay "actual expenses" to a displaced business owner for three types of expenses: 1) actual and reasonable moving expenses; 2) actual direct losses of tangible personal property as a result of moving or discontinuing a business operation, not exceeding the reasonable expense to relocate the property; and 3) actual reasonable expenses in searching for a replacement site.
The State's local project manager for I-49, Lester Becker, testified that the State pays a maximum of $1,000 for searching *1178 expenses under the "actual expense" provisions of § 3104 A.
Becker explained the "loss of tangible personal property" expense:
If they had inventory that they didn't want to move, they could sell that and attempt to sell it and loss of tangible personal property would be the difference between what their wholesale price was of that inventory and what they actually sold it for, plus the cost of advertising, the cost of selling it.
The payment "in lieu of" actual expenses is described in § 3104 C:
In the alternative, the [State] may pay to any displaced person, who moves or discontinues his business or farm operations, who elects to accept the payment authorized by this section in lieu of the payment authorized by Subsection (A) of this section, a fixed relocation payment in an amount equal to the average annual net earnings of the business or farm operation, but not less than [$2,500] nor more than [$10,000]. In the case of a business, no payment shall be made under this subsection unless the [State] is satisfied that the business (a) cannot be relocated without a substantial loss of its existing patronage, and (b) is not part of a commercial enterprise having at least one other establishment, not being acquired by the state ..., which is engaged in the same or similar business....
Becker explained the "in lieu of" payment to the jury:
The in lieu of payment is in lieu of moving and it would depend on loss of existing patronage and that sort of thing. In other words, if he had a little neighborhood business and had to move out to suburbia in order to reestablish because of what was available for him on the market, then he could have qualified for an in lieu of payment. Had he been operating a business that was city-wide and ... moved six or eight blocks from where he was ... he may or may not have lost existing patronage and he could have been entitled to an in lieu of payment... except ... if he already was in the business [at the new location].
In our view, neither the fact that the amount of the "in lieu of" payment is based on the business's annual net earnings, nor that the business owner must show loss of patronage to be eligible for the "in lieu of" payment, requires that the "in lieu of" award be credited against Packard's awards for lost earnings or lost value of the business.
As we appreciate it, a business owner may elect to receive the "in lieu of" payment under § 3104 C rather than submitting proof of actual expenses under § 3104 A. According to Becker, the expenses for which the statutory benefits are owed include moving expenses, searching expenses, monetary losses on sales of goods not moved, and the cost of advertising those sales.
Although Packard's did not move, its principals, Mr. Packard and his stepson, Gary Rankin, described their extensive, albeit unsuccessful, search for a replacement site. Mr. Packard testified that the store held sales to reduce inventory, sometimes selling items below cost, and advertised those sales. The award for lost profits can be deemed to include the monetary losses on sale merchandise, but not the cost of advertising the sales. By claiming the payment "in lieu of" actual expenses, Packard's was not required to show the actual amount of its searching and advertising expenses.
On this record, we cannot say that the payment "in lieu of" actual expenses under the URAA duplicates the business loss awards. We shall not allow the State credit for the $10,000 "in lieu of" payment.

ANSWER TO APPEAL
Interest on Court Costs
By answer to the appeal, Packard's seeks to have legal interest awarded on all court costs, including the $170,219 attorney fee award and the $1,650 expert witness fee award. Citing Cajun Elec. Power Co-op. v. Owens-Corning, 605 So.2d 1387 (La. App. 5th Cir.1992) as authority for the interest award, Packard's urges us to depart from our holding in Pillow v. Board of *1179 Com'rs, 425 So.2d 1267 (La.App.2d Cir. 1982), writ recalled, that interest on attorney fees awarded under LRS 13:5111, the statute applicable here, could not be recovered. We noted in Pillow that the statute classifies the attorney fees "as a part of the costs of court," and said, "It is well settled that interest is not allowable on that portion of a judgment representing costs. DeLizardi v. Hardaway, 8 Rob. 20 (La. 1844)." 425 So.2d at 1284.
In Cajun Electric, the fifth circuit awarded legal interest on expert witness fees taxed as costs under LRS 13:3666, from date of judicial demand. The supreme court granted a writ to review the decision and held:
... legal interest may be awarded on a judgment for expert witness fees taxed as court costs. To the extent that De Lizardi conflicts with this holding, it is overruled....
... interest accrues on an award of expert witness fees taxed as court costs from the date of judgment fixing such fees.
Cajun Electric Power Coop. v. Owens-Corning Fiberglass Corp., 616 So.2d 645, 646-647 (La.1993).
We amend the judgment to award Packard's legal interest on the expert witness and attorney fee awards from the date of the trial court judgment.
Additional Attorney Fees
The trial court awarded the $170,219 attorney fee based on the law firm's work records and hourly rates charged, notwithstanding that the firm sought a fee in accord with its 1/3 contingent fee contract with Packard's. The fee awarded was taxed as costs against the State. In accord with Cajun Electric, supra, we have amended the judgment to allow legal interest on the attorney fee costs from the date of the trial court judgment, March 11, 1992, or approximately $16,000 to the date of this opinion.
Packard's seeks an additional $28,863 in attorney fees for work done on appeal. Packard's attached to its brief an affidavit attesting that four attorneys with its law firm worked 246.25 hours in connection with the appeal, at hourly rates of $100-175, for a total fee of $28,863. The affidavit lists the dates and hours spent by each attorney on each date, without detailing what work was done. Of course, we are aware of Packard's original and supplemental briefs, totaling about 100 pages, and the oral argument.
While not suggesting that the hours were not spent, the State contends an award of over $28,000 for four attorneys to prepare an appellate brief and argument is excessive.
A reasonable fee for appellate services is usually (Brookhollow, supra), but not always, awarded. Compare State, D. of Transp. & Development v. Jacob, 491 So.2d 138 (La.App.3d Cir.1986), writ denied. In Jacob, the appellate court calculated the attorney fee ($55,715) in accord with the statute, LRS 48:453(E), but denied the Jacobs' request for an additional fee for appellate services. The court said: "We are of the opinion that the above award of attorney's fees is sufficient to compensate the Jacobs' attorneys." 491 So.2d at 145.
In Brookhollow, supra, the award to the landowner was $222,245, plus $20,000 attorney fees. The appellate court awarded an additional $3,000 for services rendered on the appeal. In Monroe Redevelopment v. Succession of Kusin, 398 So.2d 1159 (La.App.2d Cir.1981), writ denied, the award was $183,000, plus $5,000 attorney fees. We awarded an additional $1,500 for services rendered on the appeal by the landowner's attorneys who lived and practiced 100 miles away from our appellate courtroom. The lower courts and the appellate courts, respectively, have discretion and authority to determine a reasonable attorney fee for services rendered before them.
In this appeal each litigant has succeeded in part. Compare Brookhollow, supra, 578 So.2d at 564. When we consider that the trial court taxed as costs the $170,219 attorney fee award with legal interest from the date of the judgment below, we conclude that that amount, plus $2,000 with legal interest from the date of this opinion, *1180 which we tax as costs, will adequately compensate Packard's law firm for its services through this court. We shall amend the judgment to increase the attorney fee award by that amount with legal interest on the increase from the date of this opinion. Cajun Electric, supra.

DECREE
Reversing the jury's awards for loss of leasehold advantage and loss of fixtures and improvements, and reducing the award for expenses in lieu of moving, we amend the judgment to reduce Packard's recovery to $644,750. We amend to award legal interest on the expert witness fee award and the trial court's attorney fee award from the date of the trial court judgment. We amend to increase the attorney fee award by $2,000 which we also tax as costs, the increase to bear legal interest from the date of this opinion. Other costs of the appeal, to the extent allowed by law, are assessed to the State.
AMENDED AND AFFIRMED.
HIGHTOWER, J., concurs in part and dissents in part with written reasons.
HIGHTOWER, Judge, dissenting in part and concurring in part.
I respectfully dissent, first, from the award of lost future profits extending beyond plaintiff's lease term.
Secondly, what has been taken (or damaged) is the lease, not the business. Thus, no award is due for the "value of a business," especially after the state adequately compensates for loss of profits.
Anent other aspects of the opinion, I concur.

APPLICATION FOR REHEARING
Before MARVIN, LINDSAY, HIGHTOWER, BROWN and WILLIAMS, JJ.
Rehearing denied.
NOTES
[1] The taking occurred in April 1986. Packard's economic expert included all of 1986 in his calculations of Packard's past losses.