STATE OF LOUISIANA, DEPARTMENT OF
TRANSPORTATION AND DEVELOPMENT

VERSUS

MOTIVA ENTERPRISES, LLC

C/W

STATE OF LOUISIANA, DEPARTMENT OF
TRANSPORTATION AND DEVELOPMENT

VERSUS

DR. COLDWELL DANIEL, III, ET AL

NO. 19-CA-32
C/W
19-CA-33

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 643-350 C/W 636-170, DIVISION "J"
HONORABLE STEPHEN C. GREFER, JUDGE PRESIDING

October 02, 2019

**MARC E. JOHNSON**
**JUDGE**

Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and John J. Molaison, Jr.

**<u>AFFIRMED</u>**
 **MEJ**
 **FHW**
 **JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA, DEPARTMENT OF TRANSPORTATION AND
DEVELOPMENT
     James L. Bradford, III
     D. Stephen Brouillette, Jr.

COUNSEL FOR DEFENDANT/APPELLANT,
MOTIVA ENTERPRISES, LLC
     Kelly B. Becker
     Matthew D. Simone
     Kathryn Z. Gonski
     Trinity A. Brown

**JOHNSON, J.**

In this expropriation case, Plaintiff-in-reconvention, Motiva Enterprises, LLC, appeals the trial court's judgment granting a directed verdict in favor of the State of Louisiana, Department of Transportation and Development ("DOTD"), dismissing all of Motiva's reconventional claims with prejudice. Because we find Motiva failed to offer sufficient evidence to satisfy its burden of proving damages, we affirm the judgment.

*FACTS & PROCEDURAL HISTORY*

This lawsuit arises out of a construction project involving the intersection of Causeway Blvd. and Veterans Blvd. in Metairie that began in 2009 and ended in 2012. In connection with the project, the DOTD filed suit in 2006 to expropriate land for purposes of the construction project. Specifically, it sought to permanently take four feet of land for the project and to use an additional ten feet of the land for a temporary servitude during construction.

The land at issue was owned by Dr. Coldwell Daniel, III, who leased it to Shell Oil Company in 1957, which later, in 1998, assigned the lease to Motiva Enterprises, LLC (a company formed from a partnership between Shell and Texaco). At the time of trial, the lease was still in existence and contained several five-year option periods to extend the lease through 2025. The lease gave Shell – and then Motiva by assignment – the exclusive right to build on the site and to use the site for a gas station.[1]

After the expropriation at issue and prior to the beginning of the construction project, Shell decided to exit the retail business and move strictly to a wholesale supply business. To accomplish this, Shell sought to divest itself of all the gas stations it owned and operated, as well as those it leased to third parties, across the

---

[1] Although the lessee company name changed in 1998, the gas station still operated, and continues to operate, as a Shell station.

country by packaging up each of its markets into a series of bulk sales to third parties, whereby Shell would maintain the supply relationship to the buyer. The New Orleans area bulk sale included the Shell station at issue, which was located at the intersection of Causeway Blvd. and Veterans Blvd. and situated on the land involved in the expropriation. Shell solicited bids for the bulk sale by first generating an information memorandum describing the market and the assets, and selecting certain bidders. Shell then made available to the selected bidders a template of the purchase and sale agreement and an electronic data room where the bidders could review information regarding the sites – such as environmental reports and existing leases, and invited the bidders to submit a bid.

The winning bid for the New Orleans area bulk sale came from LavigneBaker Petroleum, LLC, a Shell wholesaler, in the amount of $37 million. In December 2007, Shell and LavigneBaker entered into an Asset Purchase and Sale Agreement for 52 Shell branded retail service stations in the New Orleans area, including the site involved in the expropriation. In the Asset Purchase and Sale Agreement, LavigneBaker acknowledged that the agreed upon purchase price reflected the fact that the site at issue was subject to a public taking. As part of the sale, LavigneBaker was required to enter into a separate Branding and Product Purchase Commitment Agreement, wherein it agreed to purchase a minimum volume of gasoline from Shell for the purchased sites, which it signed in February 2008.

Prior to the sale, in August 2006, the DOTD filed an expropriation lawsuit against Dr. Daniel, as owner of the land sought to be expropriated, and Shell Oil Company, as lessee of the land at issue. The DOTD estimated just compensation for the taking to be $28,255, which it sought to deposit into the registry of the court. An order of expropriation was signed by the trial court on August 30, 2006. Thereafter, the parties stipulated that Motiva Enterprises, LLC ("Motiva") was the

proper lessee of the land at issue and that Motiva would be named in place of Shell Oil Company.

In a separate lawsuit, filed in April 2007 and amended in May 2007, the DOTD filed an expropriation petition against Motiva seeking to acquire certain improvements, including a self-illuminated sign, concrete paving and curbing, and landscaping, allegedly owned by Motiva that were located within a certain right of way needed for the construction project. The DOTD estimated the just compensation for these improvements to be $29,510. An order of expropriation was signed by the trial court on April 4, 2007. On motion of Motiva, the two lawsuits were consolidated.

On April 13, 2007, the DOTD and Dr. Daniel filed a joint petition indicating they had reached a settlement in connection with the expropriation, with Dr. Daniel agreeing to accept $25,350 as a final award of just and adequate compensation for the expropriated property. A judgment confirming the settlement was signed on April 19, 2007.

Motiva subsequently filed an answer and reconventional demand. In its reconventional demand, Motiva alleged it operated a gas station/convenience store on a portion of the expropriated property. Motiva asserted that it would not be able to conduct its business from this location in its post-taking condition. Specifically, Motiva alleged it would not be able to safely operate its dispensing units on the Causeway Blvd. side of the business, which would greatly impact the continued operation of the station. Motiva averred it was entitled to be compensated to the full extent of its economic loss, including lost profits.

Approximately two and one half years later, in March 2010, Motiva amended its reconventional demand to indicate that it had assigned its interests in the subject property and improvements to LavigneBaker in February 2008. Motiva claimed that it assigned its rights at a greatly reduced price due to the diminution in

value of the property caused by the expropriation and the anticipated loss of economic revenue during the construction. As such, Motiva sought damages for diminution of property value and lost profits caused by the expropriation. In November 2017, Motiva supplemented its reconventional demand to specifically claim damages related to its leasehold interest in the subject property, which Motiva claimed was negatively affected by the expropriation.

The matter proceeded to a jury trial on May 17, 2018. At the end of the third day of trial, Motiva rested its case. At the beginning of the fourth day of trial, the DOTD moved for a directed verdict claiming Motiva failed to offer sufficient evidence for a reasonable juror to determine damages. The DOTD specifically argued that Motiva did not establish any sales price for the site at issue or the market value of its leasehold interest and that it failed to offer evidence of actual lost profits. The trial court granted the motion for directed verdict and dismissed Motiva's reconventional demands with prejudice.

In granting a directed verdict, the trial court summarized the case as presenting two issues: a claim for loss of profits and the effect the expropriation had on the value of the leasehold. The trial court noted that while there was evidence of a change in volume at the gas station prior to and after the taking, there was no testimony or evidence of a dollar value on that change in volume or the actual costs incurred by Motiva as a result of that change in volume. The trial court also found Motiva failed to carry its burden of proving damages relating to its leasehold interest. While it acknowledged testimony regarding Motiva's belief the station was worth between $2.5 and $3 million and that Motiva believed it received a reduced value of $800,000 for the station, the trial court noted that the sale of the station was part of a bulk sale and that there was no evidence of an individual sales price or negotiated price for the station. The court observed Motiva's value of the property was based on a 10-15 year income stream and not

the value of the property immediately before and immediately after the taking as it reasoned was required under La. R.S. 48:453(B). As such, the trial court concluded there was no evidence of any accurate value of the loss to Motiva caused by the expropriation.

A written judgment granting a directed verdict in favor of DOTD and dismissing Motiva's reconventional demands with prejudice was signed on August 10, 2018. It is from this judgment that Motiva now appeals.

*ISSUE*

Motiva argues the trial court erred in granting a directed verdict after it presented its case. Motiva asserts that in reaching its decision, the trial court improperly usurped the function of the jury by weighing and interpreting the evidence. It further contends the trial court erred in concluding that the value Motiva placed on the station was not a valid measure of damages under La. R.S. 48:453. Motiva maintains that the diminution of sales price for its leasehold interest as a result of expropriation is a valid measure of damages under La. R.S. 48:453.[2]

*LAW & ANALYSIS*

A motion for a directed verdict is a procedural device available in jury trials for the purpose of judicial economy. The motion is appropriately made at the close of evidence offered by the opposing party and should be granted when, considering all of the evidence in the light most favorable to the non-mover, it is clear that the facts and inferences point overwhelmingly in favor of the mover that reasonable jurors could not reach a contrary verdict. La. C.C.P. art. 1810; *Baudy v. Travelers Indem. Co. of Connecticut*, 13-882 (La. App. 5 Cir. 4/9/14); 140 So.3d 125, 131.

---

[2] While the trial court granted a directed verdict on two grounds – failure to prove damages for lost profits from the reduction of the amount of fuel sold at the site and failure to prove damages related to Motiva's leasehold interest – Motiva only appeals the directed verdict as it relates to damages for the alleged reduced value of its leasehold interest. (*See* Motiva's Reply Brief, p.2, "Motiva's appeal challenges the trial court's directed verdict as to only *one* of the claims it brought to trial: its claim for damages due to the diminished sales price it received for its leasehold interest." Emphasis in original.)

The trial court has much discretion in determining whether a directed verdict should be granted. *State, Dept. of Transp. And Development v. Lauricella Land Co., L.L.C.*, 10-790 (La. App. 5 Cir. 4/28/11); 65 So.3d 712, 717. The standard of review on appeal is whether reasonable persons could not reach a contrary verdict under the evidence submitted. The appellate court must determine if the record supports the granting of a directed verdict based on a sufficiency of evidence determination (a question of law), and not a credibility determination (a factual issue). *Id.* Furthermore, the reviewing court must consider the propriety of a directed verdict in light of the substantive law applicable to the claims. *Baudy*, *supra*.

The Louisiana Constitution of 1974, Article I, § 4 provides in pertinent part that "[p]roperty shall not be taken or damages by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit . . . . [T]he owner shall be compensated to the full extent of his loss." The term "property" includes both tangible property and intangible property rights, such as a lessee's leasehold interest. *Franklin Southland Printing Co., Inc. v. New Orleans Aviation Bd.*, 99-60 (La. App. 5 Cir. 7/27/99); 739 So.2d 977, 981, quoting *Packard's Western Store v. State, D.O.T.D.*, 618 So.2d 1166 (La. App. 2d Cir. 1993), *writ denied*, 629 So.2d 345 (La. 1993). Thus, a lessee has a constitutional right to just compensation in expropriation proceedings. *Parish of Jefferson v. Powerline, LLC*, 14-462 (La. App. 5 Cir. 12/12/13); 131 So.3d 250, 254.

Property is "damaged" when the expropriation diminishes the value of the tangible property or the intangible property right. *Packard's Western Store*, 618 So.2d at 1172. Damage to an intangible property right that occurs before the tangible property is taken is compensable upon proof that the expropriation caused the damage. Compensation for the "full extent of loss" requires the property

owner to be put in as good of a pecuniary position as the owner would have been had the property not been damaged. *Id.*

The measure of damages for expropriated property is provided in La. R.S. 48:453, which in pertinent part provides:

> A. The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court, without considering any change in value caused by the proposed improvement for which the property is taken.
>
> B. The measure of damages, if any, to the defendant's remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed or planned.
>
> C. The owner shall be compensated to the full extent of his loss. The court shall include in its consideration the difference between the rate of interest of any existing mortgage on an owner-occupied residence and the prevailing rate of interest required to secure a mortgage on another owner-occupied residence of equal value.

The burden of proving damages in an expropriation proceeding rests on the party seeking them, who must prove such damages with legal certainty by a preponderance of the evidence. *Powerline, supra.* Speculation, conjecture, mere possibility or unsupported probability are not sufficient to support an award of damages for expropriation. *Huckaby v. Red River Waterway Com'n,* 27,113 (La. App. 2 Cir. 10/12/95); 663 So.2d 414, 421, *writ denied*, 95-3007 (La. 3/8/96); 669 So.2d 403.

In this appeal, Motiva argues that it put forth sufficient evidence that its leasehold interest diminished in value after the expropriation. Specifically, it points to the testimony of Larry Coburn, a Shell employee who was the project manager involved in the bulk asset sale, who testified that he thought the site at issue was worth "anywhere from two and a half to five million dollars,"[3] but that

---

[3] When asked his view of the real value of the site, Mr. Coburn testified that he thought the site was worth between $2.5 and $5 million. However, earlier in his testimony, Mr. Coburn testified that "we thought it was valued . . . anywhere between two and half to three million dollars."

Shell only received $800,000 for the site because of the expropriation. He explained that the uncertainty surrounding the site regarding the impending construction related to the expropriation and its impact on the ability to use all of the gas dispensers led to the negotiated reduced valuation of $800,000 for the site. Although Mr. Coburn was involved in negotiating the bulk sale, he admitted that he had no input into the valuation of the site at issue for the asset purchase agreement between Motiva and LavigneBaker. There was no other testimony relating to the value of Motiva's leasehold interest.

Upon review, we find a directed verdict was proper in this case as Motiva's evidence of its damages for diminished value of its leasehold interest at the time of the bulk sale was woefully inadequate.

There are various methodologies for determining the value of a leasehold interest. Most of the Louisiana jurisprudence discusses such value in the context of a leasehold advantage, which is when a tenant's contractual rent is less than what the property would bring on the rental market at the time of the taking.[4] *Packard's Western Store*, 618 So.2d at 1176. However, we recognize that the leasehold advantage rule is not always exclusively determinative of the lessee's rights. *See State ex rel. Department of Highways v. Cefalu*, 233 So.2d 273, 276 (La. App. 1st Cir. 1970), *writ refused*, 236 So.2d 502 (La. 1970).

In *Red River Waterway Com'n v. Fry*, 628 So.2d 38, 42 (La. App. 2d Cir. 1993), the Second Circuit noted that various methodologies may be employed to prove economic loss which may exceed the market value of the property, but cautioned that the method used to prove the loss must demonstrate by a

---

[4] If the fair market value of the lease is equal to or less than the agreed rental, there is no leasehold advantage and no money is owed to the lessee. If the value of the lease at the time of the taking is greater than the contract rent, the lessee is entitled to the difference. Where a leasehold advantage is due the lessee, it is payable out of the total market value of the property awarded the landowner, if the value of the landowner's interest is determined on a basis including consideration of the economic value of the lease at the time of the taking. *State, through Dept. of Highways v. Maggio*, 399 So.2d 716 (La. App. 1st Cir. 1981).

preponderance of the evidence that the actual loss was not general, as to all owners in the area, but was specifically sustained because of the taking from the business in question. In *Fry*, the damage award to the lessees was based on expert testimony, which considered multiple factors in evaluating the value of the business losses suffered by the lessees, who leased the land at issue and cleared it for purposes of subleasing it to farmers. Specifically, the lessees' expert testified that the expropriation removed the most valuable crop land and left only pasture land. In determining the lessees' losses, the expert considered the fact that a subsequent attempt to farm the remaining land was unsuccessful. The lessees' expert specifically testified as to the amount the lessees would have continued to earn per year as income on the property but for the expropriation, which was based on the income the lessees received in the years immediately prior to the taking.

Various methodologies for valuing a leasehold interest are succinctly discussed in *Eminent Domain: Lessee's Recovery of Compensation for Taking of Leasehold Interest*, 56 Am. Jur. Proof of Facts 3d 419. Under §16, entitled "Valuation methodologies," it is observed that values and damages in condemnation proceedings are not always susceptible of precise proof; however, the value "must be arrived at through a recognized method which cannot be fundamentally unfair and unjust." It points out that there are three traditional appraisal methodologies recognized by the courts for arriving at the fair market value of the expropriated property:

    (1)    the market data or comparable sales approach which evaluates recent sales of comparable properties in the marketplace;

    (2)    the reproduction cost approach which evaluates the current cost of reproducing the property less depreciation from all sources; and

    (3)    the income or capitalization approach which evaluates the property's net earning power based upon the capitalization of net income.

These three methodologies were used by the expert in *State Dept. of Transp. and Development v. Chachere*, 574 So.2d 1306 (La. App. 3d Cir. 1991), in valuing a lessee's leasehold interest in two billboards that sat upon land that was expropriated. Although he appraised the value of the leasehold interest using all three methodologies, the expert ultimately settled on the market data approach as the most valid.

In the present case, there was absolutely no evidence of any methodology used to determine the value of Motiva's leasehold interest either before or after the expropriation. Rather, the only evidence of the value of Motiva's leasehold interest was a fact witness who thought the property was worth between $2.5-5 million prior to the expropriation, but had no input into the actual valuation of the site for purposes of the bulk sale. Motiva failed to offer any expert testimony regarding the value of the lease prior to the expropriation and the value of the lease after the expropriation based on the accepted methodologies for valuing property in an expropriation case. Therefore, we find Motiva failed to prove with legal certainty the diminished value of its leasehold interest resulting from the expropriation. Based on the evidence presented, we conclude a reasonable juror could not have reached a contrary result.

### DECREE

Accordingly, we find a directed verdict was properly granted in favor of the DOTD at the conclusion of Motiva's case.

**AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

MARY E. LEGNON
INTERIM CLERK OF COURT

CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**OCTOBER 2, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_____
**MARY E. LEGNON**
INTERIM CLERK OF COURT

# 19-CA-32
### C/W 19-CA-33

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE STEPHEN C. GREFER (DISTRICT JUDGE)
KELLY B. BECKER (APPELLANT)          GREGORY G. D'ANGELO (APPELLEE)          KATHRYN Z. GONSKI (APPELLANT)
JAMES L. BRADFORD, III (APPELLEE)     D. STEPHEN BROUILLETTE, JR. (APPELLEE)

**MAILED**
JONATHAN C. AUGUSTINE (APPELLEE)     SARAH L. JOHNSON (APPELLEE)     MATTHEW D. SIMONE (APPELLANT)
ATTORNEY AT LAW                      ATTORNEY AT LAW                 TRINITY A. BROWN (APPELLANT)
1201 CAPITOL ACCESS ROAD             1507 DEMOSTHENES STREET         ATTORNEYS AT LAW
BATON ROUGE, LA 70802                METAIRIE, LA 70005             701 POYDRAS STREET
                                                                    SUITE 5000
                                                                    NEW ORLEANS, LA 70139